Mark J. HOFFMAN, Plaintiff,

v.

CARGILL, INCORPORATED, Defendant.

No. C 97–3015–MWB.

United States District Court, N.D. Iowa, Central Division.

Aug. 2, 1999.

John Werden of Van Dyke & Werden, Carroll, Iowa, for Plaintiff Mark J. Hoffman.

Robert D. Houghton of Shuttleworth & Ingersoll, Cedar Rapids, Iowa, for Defendant Cargill, Inc.

Marc L. Fleischaker and Nancy S. Appel of Arent Fox Kintner Plotkin & Kahn, P.C., submitted a brief, for Amicus National Grain and Feed Association.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION TO CONFIRM ARBITRATION AWARD

BENNETT, District Judge.

### TABLE OF CONTENTS

I. **INTRODUCTION** .................................................. 864
   A. *Background Findings of Fact* ............................ 864
   B. *Procedural Background* .................................. 867

II. **LEGAL ANALYSIS** ............................................. 870
   A. *Subject Matter Jurisdiction* ........................... 870
   B. *Confirmation Or Vacation Of The Arbitration Award* ..... 873
     1. *Applicable standards* ............................... 873
       a. *Statutory standards* ............................ 873
       b. *Extra-statutory standards* ...................... 874
         i. *"Irrationality" and "manifest disregard of the law."* ........ 875
         ii. *Arbitrariness and contravention of public policy* ............. 877
         iii. *Fundamental unfairness* ..................... 878
     2. *Application of the standards* ....................... 880
       a. *Hoffman's challenges* ........................... 880
       b. *Hoffman's statutory challenges* ................. 883
         i. *Section 10(a)(2) "partiality" challenges* .......... 883
         ii. *Section 10(a)(3) "misconduct" challenges* ......... 887
       c. *Hoffman's extra-statutory challenges* ........... 889
         i. *"Irrationality" challenge* ..................... 889
         ii. *"Manifest disregard of the law" challenges* ....... 891
         iii. *"Fundamental unfairness" challenges* ........... 891

III. **CONCLUSION** ................................................ 895

Shortcuts may lead to long delays. Certainly, the hope that arbitration would prove to be "a less costly and less complicated alternative to litigation," *see, e.g., Morgan v. Smith Barney, Harris Upham & Co.,* 729 F.2d 1163, 1165 (8th Cir.1984), has been disappointed in this case. Instead, this dispute over grain contracts

between a grain producer and an owner of a grain milling facility has pursued a three-year odyssey through arbitration and litigation. The case has finally returned to federal court on the grain miller's motion to confirm an arbitration award in its favor on its claims of breach of contract against the grain producer. The grain producer, however, now challenges this court's subject matter jurisdiction to confirm the arbitration award, and further resists confirmation of the award on numerous grounds.

## I. INTRODUCTION

This lawsuit between plaintiff Mark J. Hoffman, a grain producer, and defendant Cargill, Inc., the owner of a milling facility in Blair, Nebraska, involves disputes over ten contracts for the sale and delivery of almost half a million bushels of corn. The contracts were to be performed in 1996 and 1997, but performance of the contracts fell apart during the summer of 1996 when Hoffman questioned whether Cargill's scales at its Blair facility, or the people operating those scales, were obtaining fair and accurate weights of corn upon delivery. Now before the court is Cargill's motion to confirm the arbitration award of $408,262.50 plus interest in Cargill's favor on its breach-of-contract claims rendered by an arbitration panel of the National Grain and Feed Association (NGFA). Hoffman resists confirmation of the award.

## A. Background Findings of Fact

In the fall of 1995 and winter of 1996, Hoffman, a farmer in Carroll County, Iowa, and Cargill, a Delaware corporation with its principal place of business in Minneapolis, Minnesota, entered into five contracts for the sale and purchase of corn from the last harvest, the so-called "old crop" contracts. Under those contracts, Hoffman was to deliver a total of 350,000 bushels of corn to Cargill's milling facility at Blair, Nebraska, during the spring of 1996.[1] During the winter of 1995 and early spring of 1996, Hoffman and Cargill also entered into five contracts for delivery of corn from the next harvest, the so-called "new crop" contracts, under which Hoffman was to deliver another 125,000 bushels of corn to Cargill's milling facility at Blair, Nebraska, during late 1996 and early 1997.[2]

Although the specific terms of the ten contracts varied, each contract contained the following clause, directly above the signature line:

> PLEASE NOTE: **Unless otherwise specified or modified herein, the rules of the appropriate association listed above shall govern this contract. All disputes relating to this transaction shall be resolved by binding arbitration in accordance with the rules of such associations. The parties agree to arbitrate, to be bound by the arbitration award, and agree that judg-**

1. The "old crop" contracts in question were as follows:

| Date | Contract | Bushels | Price | Delivery Period |
|------|----------|---------|-------|-----------------|
| 9/11/95 | 10306 | 50,000 | $2.87 | March 1–31, 1996 |
| 9/11/95 | 10307 | 100,000 | $2.94 | July 1–31, 1996 |
| 9/12/95 | 10320 | 100,000 | $3.00 | July 1–15, 1996 |
| 9/18/95 | 10388 | 50,000 | $3.00 | February 1–29, 1996 |
| 2/29/96 | 12794 | 50,000 | $2.90 | May 1–31, 1996 |

2. The "new crop" contracts in question were as follows:

| Date | Contract | Bushels | Price | Delivery Period |
|------|----------|---------|-------|-----------------|
| 12/11/95 | 11592 | 20,000 | $2.70 | December 1–31, 1996 |
| 2/8/96 | 12406 | 30,000 | $2.84 | January 1–31, 1997 |
| 2/16/96 | 12615 | 25,000 | $2.97 | February 1–28, 1997 |
| 2/29/96 | 12795 | 30,000 | $3.00 | December 16–31, 1996 |
| 3/12/96 | 12887 | 20,000 | $3.04 | October 1–31, 1996 |

ment upon the award may be entered in any Court having jurisdiction.

Defendant's Motion to Compel Arbitration, Exhibit A (emphasis in original). Additionally, each contract identified the National Grain and Feed Association (NGFA) as the association providing the rules to govern arbitration proceedings.

According to the contracts, the "weights to govern" were "destination" weights, *i.e.*, weights determined at Cargill's Blair facility. The weighing procedure at Cargill's Blair facility required drivers to drive their trucks loaded with corn onto either of two Mettler–Toledo scales, signal the weigher to obtain a gross weight, dump the grain through the scale into a hopper—from which grain was conveyed to the milling facility by a conveyor belt—then signal the weigher to obtain a "tare" weight for the empty truck. Comparison of the gross and tare weights determined the net weight of grain delivered. A computer recorded the gross and tare weights and printed a ticket showing these weights as well as the net weight. This system, while efficient, did not provide any opportunity to reweigh a load if there was a dispute between the driver and weigher over the weight of the load. At the time the contracts in question were to be performed, Hoffman did not have his own scale available for weighing loads of grain. However, he has since put in a scale at his farm for determining "origin weights" on loads of corn he ships elsewhere.

Hoffman trucked his own corn to the Blair facility, as well as contracting with several of his neighbors to deliver their corn to the Blair facility. The parties agree that at the time of contracting, the contract prices for future delivery at the Blair facility were at a significant premium over prices in the region generally for such contracts, making it attractive to bear the additional transportation costs to deliver at Blair, approximately 100 miles from Carroll, Iowa. However, owing to an unprecedented rise in corn prices during 1996, by the time delivery was due on Hoffman's contracts, the contract prices were well below the prevailing "cash" market prices.

Hoffman delivered 27,928 bushels of corn to Cargill's Blair facility between March of 1996 and April 12, 1996, on his "old crop" contracts. However, beginning in about January of 1996, he had concerns that Cargill's scales were inaccurate, or that Cargill's weighers were obtaining weights at the wrong times, systematically shorting him by showing higher tare weights. In March and April, these concerns ripened into repeated complaints to Cargill officials and agents, to the point that Hoffman eventually refused to deliver any more grain until the problems were corrected.

In an effort to resolve the dispute, the parties, through counsel, considered various solutions. Among the proposed solutions were that Hoffman's loads should be weighed at the scales at another facility adjacent to Cargill's Blair facility, but owned by Terra International, with weighing charges to be paid by Cargill. Another proposed solution was that delivery on Hoffman's contracts with Cargill would be accepted at the AGRI Grain Marketing elevator in Council Bluffs, which was affiliated with Cargill, with Cargill offering to pay Hoffman an extra 2 cents per bushel to cover Hoffman's additional transportation costs to Council Bluffs. On July 8, 1996, in what he described as a "test," Hoffman delivered two loads of corn, approximately 900 bushels net each, first weighing the loads at the Terra facility, then reweighing them at Cargill's Blair facility for comparison. Payment was made according to the more favorable weights. Although one load showed nearly identical weights at the two facilities, the weights for the second load differed by a few hundred pounds. Hoffman believed that the difference proved that Cargill's Blair scales or weighers were systematically shorting him, or at least were obtaining unreliable weights. Although the Blair scales "failed the test," according to Hoffman, he nonetheless rejected all proposals

to weigh or deliver corn anywhere other than at Cargill's Blair facility, and reiterated his refusal to deliver at Blair until the weighing problems were corrected.

Hoffman next complained to the Nebraska Department of Agriculture, Weights and Measures Division. Steve Malone, Director of the Nebraska Weights and Measures Division, reviewed Hoffman's records from the "test" on July 8, 1996. Malone found that the weight discrepancies raised sufficient concerns that he and Richard Suiter, a field supervisor, went to examine the scales at Cargill's Blair facility on August 12, 1996. They were able to demonstrate that, contrary to assertions of Cargill employees—and apparently much to the surprise of those employees—tare weights could be obtained on the scales at Blair before all grain was removed from the hopper, at least potentially resulting in higher tare weights than would be obtained with a proper procedure.

After discussions with Cargill personnel, the State inspectors required that certain changes be made to the operating system for the scales at the Blair facility. These changes included changes to the computer software to introduce some time delays before weights could be taken and adding some sensors to the bottom of the hopper to make sure that the scale did not print a ticket until there was no grain in the hopper. More specifically, the system was reconfigured to put in a 12-second time delay between the time the trucker pushed the button indicating the trucker was ready for a weight to be taken and the time the weight would actually be taken and a ticket printed if the weigher also pushed his or her button. Furthermore, unless the sensors in the hopper indicated the hopper was empty at the time the buttons were pushed, no weight would be taken, and no ticket would be printed, until the hopper was empty, the weigher had reset the system, and the weigher pushed the button again. Steve Malone testified before this court that the State instructed Cargill on what was expected, but that the actual proposed solutions came from Cargill. Although Mr. Malone described the changes as "requirements," the State inspectors did not institute a formal administrative action or "red-tag" the scales, which would have taken them out of commercial operation, because the scales could obtain accurate weights if used appropriately.[3]

The State inspectors originally directed that the changes to the Blair scales be completed by early September. On September 5, 1996, however, Cargill requested an extension of time to complete the changes. The changes were ultimately completed in early December of 1996. Mr. Malone and Mr. Suiter again inspected the scales on December 18, 1996, and determined that all corrections had been made.

3. Cargill objected to the testimony of Mr. Malone before this court as testimony that could have been presented at the arbitration hearing, and pointed out that Mr. Malone's report to Mr. Hoffman on his review of the Blair scales had been submitted to the arbitrators, *see* Exhibit K, so that his testimony was simply "old wine in new bottles." Transcript on Motion to Vacate, p. 6, *l.* 21, to p. 7, *l.* 14. Absent subpoena power, Mr. Hoffman apparently believed he could not compel Mr. Malone to appear at the arbitration hearing. That belief is not unreasonable, even in light of Mr. Malone's testimony before this court that his department's policy was that its personnel would probably appear at an arbitration hearing without a subpoena if asked, since Mr. Malone also testified that he had requested that Mr. Hoffman subpoena him to appear at the hearing before this court. *See* Transcript of Hearing on Motion to Vacate, p. 29, *ll.* 14–22. Cargill's assertion that Mr. Malone could have been subpoenaed for the arbitration hearing is undercut by the lack of subpoena power under the NGFA arbitration rules. As to the evidentiary question, the court finds that Mr. Malone's testimony was relevant and admissible in a proceeding involving judicial review of an arbitration decision, for example, to the extent his testimony demonstrated prejudice to Hoffman from inability to subpoena witnesses, or the "irrationality" of the arbitrators' decision. However, as a practical matter, the court has not relied on evidence from Mr. Malone that was not elsewhere available in the arbitration record.

After the Blair scales failed his "test" on July 8, 1996, Hoffman again refused to deliver any more grain on the "old crop" contracts. On July 25, 1996, Cargill made a final proposal that Hoffman deliver corn—"old" or "new" crop—in October and November against the "old crop" contracts, but pay a $1.34 per bushel market difference. Cargill informed Hoffman that unless this proposal was accepted, the "old crop" contracts would be canceled and Cargill would seek damages for Hoffman's breach. Hoffman did not accept the offer. On July 29, 1996, Cargill canceled the "old crop" contracts, claiming damages of $464,760.14 as the difference between the contract prices and the actual market price of $4.42 per bushel.

Notwithstanding cancellation of the "old crop" contracts in July of 1996, between October 21 and October 24, 1996, Hoffman delivered five loads of corn against "new crop" contract 12887. Hoffman testified that it was his understanding from Mr. Malone that the scales at Blair would be fixed by mid-October; however, he had not received the confirmation Mr. Malone had promised him that the scales were fixed before delivering some of his corn in late October. Cargill withheld payment on these deliveries, instead placing the funds in what it described as an "escrow" account,[4] pending payment of its damages on the "old crop" contracts. When Hoffman did not receive payment for the October deliveries, he informed Cargill that he would not deliver any more corn to the Blair facility. Cargill therefore canceled the five "new crop" contracts on November 11, 1996.

### B. Procedural Background

Pursuant to the arbitration clauses in the contracts, in December of 1996, Cargill initiated arbitration proceedings for the five "old crop" contracts. On December 3, 1996, Cargill and Hoffman executed a Contract for Arbitration as required by NGFA

rules. This contract provided that both parties agreed to submit disputes relating to contracts numbered 10306, 10307, 10320, 10388 and 12795—the "old crop" contracts—to arbitration by the NGFA. Cargill filed its First Argument with the NGFA on January 3, 1997. Hoffman submitted his combined Notice of Revocation of Agreement to Arbitrate and Answer on February 11, 1997. Hoffman stated that he "revoke[d] the agreement to arbitrate this dispute and further [gave] notice of his intention to refuse to continue these arbitration proceedings," asserting that the arbitration clauses were not enforceable under either Iowa or Nebraska law, and that the NGFA arbitration rules were inadequate to resolve the disputes between the parties, because they did not provide any discovery procedures.

Instead of proceeding to arbitration, on February 21, 1997, Hoffman filed this diversity lawsuit pursuant to 28 U.S.C. § 1332. In Count I of his complaint, Hoffman sought declaratory judgment that the arbitration clauses were invalid and thus unenforceable. In Count II, he sought reformation of the contracts. In Counts III through VII, Hoffman sought specific performance of the contracts as well as damages for breach of contract, misrepresentation, negligence, and conversion.

On March 17, 1997, in lieu of answering Hoffman's complaint in this federal court, Cargill moved to compel arbitration and stay proceedings, or in the alternative to dismiss. The court heard telephonic oral arguments on Cargill's motion on June 23, 1997. Thereafter, by order dated July 2, 1997, the court granted Cargill's motion to compel arbitration, stayed these proceedings pending arbitration, and denied Cargill's motion to dismiss as moot. *See generally Hoffman v. Cargill, Inc.*, 968 F.Supp. 465 (N.D.Iowa 1997). However, the court included in that order the following expression of concern:

---

4. Hoffman disputes whether this account was indeed an "escrow" account controlled by a

third party, or an account to which Cargill retained unilateral access.

One final word of caution. In this age of complex and costly litigation, the incantation "ADR" (alternative dispute resolution) is an increasingly popular mantra. Arbitration, a longstanding form of ADR, is considered by some to be a panacea for the perceived evils of civil litigation. However, when arbitration proceedings fail to reach a minimum level of fairness, they become an "alternative" by which this court will not abide. The court is acutely aware that through § 10 of the [Federal Arbitration Act or] FAA, [9 U.S.C. § 10,] Congress has placed strict limitations on its discretion to review the adequacy of arbitration proceedings. Nevertheless, upon request of either party, this court is committed to a post-arbitration review to ensure that any result reached is the product of a fundamentally fair arbitration proceeding.

*Id.* at 478. The question of whether the parties received a fundamentally fair arbitration proceeding is now before the court.

Pursuant to the court's order to compel arbitration, the parties reinitiated NGFA arbitration to attempt to resolve their dispute. In the arbitration proceedings, Cargill asserted its claims of breach of contract based on Hoffman's refusal to deliver grain. Cargill sought damages of $464,-760.14 plus interest as the difference between the contract and market prices of grain at the time of breach and cancellation of the "old crop" contracts. Hoffman asserted counterclaims of breach of contract by issuing weight certificates falsely representing that Cargill's weighers were federally licensed and by not providing accurate destination weights. He also asserted claims that Cargill had violated NGFA Grain Trade Rules by attempting to change contract terms and by canceling the "new crop" contracts on the basis of alleged breach of the "old crop" contracts. Hoffman sought to be excused from the "old crop" contracts on the basis of Cargill's breach, but on his own claims, he sought specific performance of the contracts or damages for their breach, as well as damages for load shortages in 1995 and 1996, non-payment for his October 1996 deliveries, and storage costs for grain he could not deliver because of Cargill's breach. His monetary damages allegedly totaled $298,264.30 plus interest. The parties voluntarily exchanged some documents and conducted depositions of some pertinent witnesses, but the NGFA arbitration rules do not provide for formal discovery. The parties admit that the discovery conducted was in the shadow of this court's order expressing concern that the arbitration proceedings be fundamentally fair.

A hearing was held before a panel of three arbitrators in Omaha, Nebraska, on July 28 and 29, 1998. The chairman of the arbitration panel was Vince Goecke, the Vice President of Columbia Grain International, Inc., in Great Falls, Montana, and the other members were Jay Mathews, Grain Manager, Effingham Equity, in Effingham, Illinois, and Richard West, Chief Executive Officer of Prairie Central Coop, Inc., in Chenoa, Illinois. Hoffman requested that the hearing be continued to a later date so that he could obtain certain discovery, and the parties jointly requested that the arbitration panel issue subpoenas to compel the attendance of certain witnesses. Both requests were denied. However, the record was left open for post-hearing supplementation.

The panel rendered its unanimous decision on December 16, 1998. In their decision, the arbitrators found that Cargill's contracts specifically provided that Cargill could designate any reasonable alternative delivery points if necessary; thus, the arbitrators concluded that Cargill was entitled to designate other delivery points as alternatives to the Blair facility. In these circumstances, the panel concluded that Cargill was entitled to cancel the contracts when Hoffman refused to deliver at points other than the Blair facility. The panel thus held for Cargill on its breach-of-contract claims.

On Hoffman's claims, the arbitrators found that the State of Nebraska had determined that operator error could cause errors to occur in printed scale tickets at the Blair facility, but that the scales themselves were accurate. Because the State of Nebraska had not taken regulatory action, the arbitrators concluded that no load shortages had occurred. The arbitrators also found that the contracts in question permitted Cargill to set off payment on corn delivered on the "new crop" contracts against its damages for nondelivery on the "old crop" contracts, and that there was no evidence that Hoffman had actually stored 320,167 bushels of corn as the result of Cargill's alleged breach of the contracts, as he contended, thus denying Hoffman's claims for damages on these grounds. The arbitrators also rejected Hoffman's claim for legal expenses. However, the arbitrators found that Cargill had improperly canceled the "new crop" contracts at contract price, rather than at fair market value.

In light of these conclusions, the arbitrators set off against Cargill's damages the $14,781.57 payment for Hoffman's "new crop" deliveries that had been held in "escrow" and $41,716.07 on Hoffman's counterclaim for miscalculation of damages on cancellation of the "new crop" contracts. Following set-offs, the arbitrators awarded Cargill $408,262.50 plus interest on its breach-of-contract claims. As the party requesting an arbitration hearing,. Hoffman had been required to advance $7,500 toward the arbitrators' expenses. Of that sum, $746.83 was refunded.

Hoffman attempted to appeal the arbitration decision pursuant to NGFA rules. However, he was unable to pay the arbitration award by cashier's check to be held by the national secretary of the NGFA pending disposition of the appeal, as required by NGFA rules. His appeal was consequently denied on January 20, 1999.

On December 22, 1998, Cargill filed in this court a notice of the arbitration decision. Then, on January 4, 1999, Cargill moved this court to confirm the arbitration award. Hoffman did not timely resist that motion, so the court entered an order granting Cargill's motion to confirm the arbitration award on January 22, 1999. Judgment was entered accordingly on January 22, 1999.

On January 28, 1999, Hoffman belatedly resisted Cargill's notice of the arbitration decision and filed a motion to vacate judgment, or in the alternative to reconsider and stay the judgment. Hoffman argued, in essence, that he had not received Cargill's motion to confirm the arbitration award and had not deemed it necessary to resist the notice of the arbitration decision. On February 18, 1999, the court entered an order vacating the judgment, restraining Hoffman from dissipating assets, establishing deadlines for pre-hearing submissions, and setting a hearing on Cargill's reanimated motion to confirm the arbitration award.

Hoffman filed a pre-hearing submission on March 3, 1999, asserting that the arbitration award should be vacated, or at least not confirmed, on several grounds. Also on March 3, 1999, Hoffman filed a resistance to Cargill's motion to confirm the arbitration award, asserting that this court lacks subject matter jurisdiction to confirm (or vacate) the award. On March 11, 1999, Cargill filed a reply in support of its contention that this court does have subject matter jurisdiction to confirm the arbitration award. On March 17, 1999, Cargill filed its own pre-hearing submission in support of confirmation of the arbitration award.

The court heard evidence and argument in support of confirmation or vacation of the arbitration award on March 22, 1999. Plaintiff Mark J. Hoffman was represented by John Werden of Van Dyke & Werden in Carroll, Iowa. Defendant Cargill, Inc., was represented by Robert D. Houghton of Shuttleworth & Ingersoll in Cedar Rapids, Iowa. On April 29, 1999, the NGFA sought leave to file an *amicus* brief in

support of confirmation of the arbitration award. Hoffman resisted the filing of such a brief and, in the alternative, sought an order permitting discovery from the NGFA. The court allowed the filing of the *amicus* brief, over Hoffman's objection, on May 17, 1999, and denied Hoffman's motion for discovery from the NGFA. This matter is now fully submitted.

## II. LEGAL ANALYSIS

Among Hoffman's challenges to confirmation of the arbitration award is his assertion that this court lacks subject matter jurisdiction to confirm an arbitration award entered in another district. Thus, the court must first examine the fundamental question of its subject matter jurisdiction to address the confirmation question, before turning to the merits of the parties' arguments for and against confirmation of the award. *See Morris v. Winnebago Indus., Inc.*, 936 F.Supp. 1509, 1530 (N.D.Iowa 1996) (federal courts are courts of limited jurisdiction and must assure themselves that they have subject matter jurisdiction over claims before them at all stages of the proceedings, even if the parties do not raise the question of subject matter jurisdiction themselves, citing *McCorkindale v. American Home Assur. Co.*, 909 F.Supp. 646, 649 n. 4 (N.D.Iowa 1995), and *Laird v. Ramirez*, 884 F.Supp. 1265, 1269–70 (N.D.Iowa 1995)).

### A. Subject Matter Jurisdiction

For his argument that this court lacks subject matter jurisdiction to confirm the arbitration award, Hoffman relies exclusively on the bare language of a provision of the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1–16, specifically 9 U.S.C. § 9. That provision of the FAA provides, in its entirety, as follows:

**§ 9. Award of arbitrators; confirmation; jurisdiction; procedure**

If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made

pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title. *If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made.* Notice of the application shall be served upon the adverse party, and thereupon the court shall have jurisdiction of such party as though he had appeared generally in the proceeding. If the adverse party is a resident of the district within which the award was made, such service shall be made upon the adverse party or his attorney as prescribed by law for service of notice of motion in an action in the same court. If the adverse party shall be a nonresident, then the notice of the application shall be served by the marshal of any district within which the adverse party may be found in like manner as other process of the court.

9 U.S.C. § 9 (emphasis added). The Eighth Circuit Court of Appeals has explained that "[s]ection 9 permits a party to seek confirmation of the award in the court specified by their agreement, or, if no court is specified, in the district within which such award was made." *Stroh Container Co. v. Delphi Indus., Inc.*, 783 F.2d 743, 747 n. 7 (8th Cir.), *cert. denied*, 476 U.S. 1141, 106 S.Ct. 2249, 90 L.Ed.2d 695 (1986).

On the basis of the italicized statutory language, Hoffman "suggested" that "the Court that has subject matter jurisdiction of the enforcement of this arbitration award may only be in [sic] the United States District Court for the District of Nebraska." Plaintiff's Resistance to Motion to Confirm Arbitration Award. Cargill disagrees, asserting that the Eighth

Circuit Court of Appeals has suggested, and other federal courts have held, that the cited provision is a permissive venue statute, but does not create a limitation on subject matter jurisdiction.[5]

▮ Looking first to the plain meaning of the statute,[6] it seems readily apparent to the court that the second sentence of the statute is permissive, because it uses the word "may," thus indicating which forum "may" hear an action to confirm an arbitration award in the absence of an effective choice of forum by the parties to the arbitration. This conclusion is reinforced by the fact that plainly mandatory language, such as "shall," is used elsewhere in the statute. *See, e.g., Terra Int'l, Inc. v. Mississippi Chem. Corp.*, 922 F.Supp. 1334, 1370–72 (N.D.Iowa 1996) (distinguishing between permissive terms, using "may," and unmistakably mandatory terms, using "shall," "will," or "must"), *aff'd*, 119 F.3d 688 (8th Cir.1997), *and cert. denied*, —— U.S. ——, 118 S.Ct. 629, 139 L.Ed.2d 609 (1997); *accord Val–U Constr. Co. v. Rosebud Sioux Tribe*, 146 F.3d at 573, 581 (8th Cir.1998) (concluded that § 9 is also permissive in another respect, its designation of a one-year period for filing

a motion to confirm an arbitration award, and therefore does not state a statute of limitations for an application for confirmation of an award, because "[i]f Congress intended for the one year period to be a statute of limitations, then it could have used the word 'must' or 'shall' in place of 'may' in the language of the statute"). The difference seems to this court to be more than coincidence or sloppy drafting; rather, when provisions of the statute are mandatory, mandatory language is consciously used, and when provisions of the statute are merely permissive, permissive language is consciously used. Nor does the plain meaning of the statute support Hoffman's assertion that the statute pertains to "jurisdiction"; rather, it pertains to "venue," that is, the appropriate forum for the confirmatory action, because the question the statute appears to answer is not whether federal courts can hear such an action, but *which* federal court is the appropriate forum in the absence of an effective choice of forum. Nor is this conclusion necessarily undermined by the language of § 10, which states grounds for judicial vacation of an arbitration award, and again refers to action by "the United

---

5. Neither party asserts that the parties had agreed on and "specif[ied] the court" to confirm the award in their contracts. *See* 9 U.S.C. § 9 (first sentence).

6. "The task of resolving the dispute over the meaning of [a statute] begins where all such inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *Chevron U.S.A. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *United States v. Union Elec. Co.*, 64 F.3d 1152, 1165 (8th Cir.1995) (citing *Ron Pair*); *United States ex rel. Harlan v. Bacon*, 21 F.3d 209, 210 (8th Cir.1994) ("When construing a statute, we are obliged to look first to the plain meaning of the words employed by the legislature …," citing *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778); *United States v. Manthei*, 979 F.2d 124, 126 (8th Cir.1992) ("When interpreting statutory language, the court must first look to the plain meaning of the language," citing *North Dakota v. United States*, 460 U.S. 300, 312–13, 103 S.Ct. 1095, 75 L.Ed.2d 77 (1983)). The Supreme Court

describes this rule as the "one, cardinal canon before all others." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). Thus, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Id.* (citing *Ron Pair*, 489 U.S. at 241–42, 109 S.Ct. 1026; *United States v. Goldenberg*, 168 U.S. 95, 102–03, 18 S.Ct. 3, 42 L.Ed. 394 (1897); *Oneale v. Thornton*, 10 U.S. (6 Cranch) 53, 68, 3 L.Ed. 150 (1810)). When the language of the statute is plain, the inquiry also ends with the language of the statute, for in such instances "the sole function of the courts is to enforce [the statute] according to its terms." *Ron Pair*, 489 U.S. at 241, 109 S.Ct. 1026 (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)); *Union Elec.*, 64 F.3d at 1165 (quoting *Ron Pair*); *Melahn v. Pennock Ins., Inc.*, 965 F.2d 1497, 1502 (8th Cir.1992) (plain meaning of a statute governs over ambiguous legislative history, citing *Ron Pair Enterprises*).

States court in and for the district wherein the award was made." 9 U.S.C. § 10(a). Section 10 simply follows on from the non-exclusive venue provision in § 9, and therefore cannot be read as limiting jurisdiction to a particular reviewing court. Instead, § 10 states grounds upon which the reviewing court, identified in § 9, may vacate the arbitration award. Thus, the plain meaning of § 9, upon which Hoffman relies, simply does not preclude this court from hearing Cargill's confirmatory action, on either jurisdictional or venue grounds.

Furthermore, in *Stroh Container Company,* the Eighth Circuit Court of Appeals rejected an argument that § 9 of the FAA confers exclusive subject matter jurisdiction for an action to confirm an arbitration award on the court in the district in which the award was entered. *Stroh Container Co.,* 783 F.2d at 747 n. 7. The court noted that "[t]he linchpin of [one party's] jurisdictional challenge is its premise that section 9 establishes a jurisdictional limitation on the availability of a federal forum for confirmation actions above and beyond ordinary diversity and federal question requirements." *Id.* at 748 n. 7. The court, however, "construe[d] section 9 ... not as creating a jurisdictional barrier, but as a special venue provision." *Id.* Thus, where the party seeking confirmation of an arbitration award properly pleaded diversity of citizenship as a basis for jurisdiction over the confirmatory action in a district other than the one in which the award was made, "subject matter jurisdiction was not defective" in the court entertaining the confirmatory action. *Id.*

Other Circuit Courts of Appeals have more recently held that subject matter jurisdiction is proper over actions to confirm arbitration awards in districts other than the one in which the arbitration award was made, *i.e.,* that § 9 identifies only "special venue," or establishes "permissive" but not "exclusive" jurisdiction, in a particular district, although this conclusion is not quite unanimous. *Compare Apex Plumbing Supply v. U.S. Supply*

*Co.,* 142 F.3d 188, 191–92 (4th Cir.) (noting the split in the circuits on the question, but concluding that "a majority of the circuits interpret section nine's venue provision as permissive," and after citing supporting decisions from other circuits, and the plain meaning of the statute, concluding that "section nine of the FAA confers permissive, rather than mandatory, venue upon district courts in and for the district in which an arbitration award was made," but that any district court that otherwise possesses subject matter jurisdiction and personal jurisdiction over the parties' confirmation petition may properly hear the confirmation petition), *cert. denied,* —— U.S. ——, 119 S.Ct. 178, 142 L.Ed.2d 145 (1998); *Sutter Corp. v. P & P Indus., Inc.,* 125 F.3d 914, 918–19 (5th Cir.1997) (resolving an apparent ambiguity in that circuit's law to hold that "[v]enue under § 9 is not mandatory" and did not prevent a federal district court in the district in which arbitration *had* been brought from "staying, dismissing or transferring" the "motion to confirm" to another district); *In re VMS Securities Lit.,* 21 F.3d 139 (7th Cir.1994) (concluding, after thorough examination of the text of the statute and comparing it with other statutory provisions, that § 9 of the FAA is permissive, and does not restrict the venue of other courts), *with Sunshine Beauty Supplies, Inc. v. United States Dist. Court for the Central Dist. of Cal.,* 872 F.2d 310, 312 (9th Cir.1989) (holding that venue in the district identified in § 9 was mandatory). *See also Baltin v. Alaron Trading Corp.,* 128 F.3d 1466, 1468 n. 4 (11th Cir.1997) (also noting the split in the circuits on the question of whether "venue" under 9 U.S.C. § 9 is exclusive or permissive, but finding it did not have to decide the question, because the district court in which the confirmatory action had been brought otherwise lacked subject matter jurisdiction), *cert. denied,* —— U.S. ——, 119 S.Ct. 105, 142 L.Ed.2d 84 (1998). This court will follow *Stroh Container Company* and the majority position of other Circuit Courts of Appeals to hold that venue and

subject matter jurisdiction for Cargill's confirmatory action are proper in this district, because this district court has diversity subject matter jurisdiction over the action and personal jurisdiction over the parties.

■ Also, one court recently held that "when a federal district court grants a motion to compel arbitration it retains jurisdiction to confirm or vacate the resulting arbitration award under 9 U.S.C. §§ 9–10." *TranSouth Fin. Corp. v. Bell,* 149 F.3d 1292, 1297 (11th Cir.1998). This court is also the court that granted Cargill's motion to compel arbitration—in an action originally brought by the party now challenging this court's subject matter jurisdiction to hear the confirmatory motion—and thus, pursuant to *TranSouth Financial Corporation,* this court has retained jurisdiction to confirm or vacate the resulting arbitration award under 9 U.S.C. §§ 9 and 10.

Hoffman's jurisdictional challenge to this court's power to hear Cargill's confirmatory motion is consequently overruled.

### B. Confirmation Or Vacation Of The Arbitration Award

#### 1. Applicable standards

Section 9 of the FAA states that a federal district court having jurisdiction over the matter "must grant" a motion to confirm an arbitration award, "unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." 9 U.S.C. § 9; *see also UHC Management Co. v. Computer Sciences Corp.,* 148 F.3d 992, 997 (8th Cir.1998) (making this observation); *accord P & P Indus., Inc. v. Sutter Corp.,* 179 F.3d 861, 870 (10th Cir.1999) (also making this observation). More specifically, the Eighth Circuit Court of Appeals recently observed,

Congress has ordained a specific, self-limiting procedure for how such a review is to occur. Section 9 of the FAA provides that federal courts "must grant" an order confirming an arbitration award "unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." Congress did not authorize *de novo* review of such an award on its merits; it commanded that when the exceptions do not apply, a federal court has no choice but to confirm.

*UHC Management Co.,* 148 F.3d at 997. The court reiterated the narrowness of judicial review of arbitration awards under the FAA:

"Judicial review of an arbitration award is extremely limited." *Kiernan [v. Piper Jaffray Companies, Inc.],* 137 F.3d [588,] 594 [ (8th Cir.1998) ].

We may not set an award aside simply because we might have interpreted the agreement differently or because the arbitrators erred in interpreting the law or in determining the facts. Although this result may seem draconian, the rules of law limiting judicial review and the judicial process in the arbitration context are well established and the parties here, both sophisticated in the realms of business and law, can be presumed to have been well versed in the consequences of their decision to resolve their disputes in this manner.

*Stroh Container Co.,* 783 F.2d at 751 (citation omitted).

*UHC Management Co.,* 148 F.3d at 998. Furthermore, the court pointed out that "selective modification" and "confirmation" of an arbitration award was only permitted on the grounds stated in section 11 of the FAA. *Id.* at 998–99. Thus, the first place to look for standards for judicial review of an arbitration award is in the FAA itself.

#### a. Statutory standards

The FAA provides for judicial vacation of arbitration awards, in pertinent part, as follows:

§ 10. **Same; vacation; grounds; rehearing**

(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—

(1) Where the award was procured by corruption, fraud, or undue means.

(2) Where there was evident partiality or corruption in the arbitrators, or either of them.

(3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

(4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).[7] Section 11 of the FAA provides further grounds for "modification

or correction" of an arbitration award by the court,[8] but the parties have not asserted that § 11 is pertinent here.

### b. Extra-statutory standards

■ Cargill appears to assert that judicial vacation, or denial of confirmation, of the arbitration award is *only* available on the four statutory grounds stated in § 10(a) of the FAA. Hoffman, however, has asserted numerous grounds, including a general "fairness" challenge, some of which do not clearly fall within any of the statutory grounds. As mentioned above, this court has stated that it is committed to considering the "fundamental fairness" of arbitration proceedings. *See supra* at p. 868; *see also Hoffman*, 968 F.Supp. at 478. The Tenth Circuit Court of Appeals has observed that "[f]ederal courts have never limited their scope of review [of an arbitration award] to a strict reading of [9 U.S.C. § 10].'" *Bowles Fin. Group v. Stifel, Nicolaus & Co.*, 22 F.3d 1010, 1012 (10th Cir.1994) (quoting *Jenkins v. Prudential–Bache Secs., Inc.*, 847 F.2d 631, 633 (10th Cir.1988));[9] *see also Denver &*

**7.** Subsection (a) provides further that "[w]here an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators." 9 U.S.C. § 10(a)(5). This subdivision will become pertinent here only if this court vacates the arbitration award in question here; in such circumstances, this court may consider whether the matter should be redirected to the arbitrators, which will in turn depend at least in part on whether the time within which the underlying contracts require an arbitration award to be made has expired.

**8.** Section 11 of the FAA provides as follows:
§ 11. Same; modification or correction; grounds; order
In either of the following cases the United States court in and for the district wherein the award was made may make an order modifying or correcting the award upon the application of any party to the arbitration—
(a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.

(b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.
(c) Where the award is imperfect in matter of form not affecting the merits of the controversy.
The order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties.
9 U.S.C. § 11; *see also Lee v. Chica*, 983 F.2d 883, 888 (8th Cir.) (discussing § 11 grounds for modification or correction of an arbitration award), *cert. denied*, 510 U.S. 906, 114 S.Ct. 287, 126 L.Ed.2d 237 (1993). Section 12 provides for a motion to "vacate, modify, or correct" an arbitration award. 9 U.S.C. § 12.

**9.** Although the court in *Bowles* asserted that the federal courts have "never" limited their review to a strict reading of 9 U.S.C. § 10, it appears that the Fifth Circuit Court of Appeals has almost never permitted review of an arbitration award *outside* of the statutory grounds stated in the FAA. *See Gulf Coast Indus. Workers Union v. Exxon Co., USA*, 70 F.3d 847, 850 (5th Cir.1995) ("Under the Fed-

*Rio Grande Western R.R. Co. v. Union Pac. R.R. Co.,* 119 F.3d 847, 849 (10th Cir.1997) ("A court may only vacate an arbitration award for reasons enumerated in the Federal Arbitration Act, 9 U.S.C. § 10, or for a handful of judicially created reasons."). Thus, the first question in this part of the court's legal analysis is whether the court may consider additional grounds to confirm or vacate an arbitration award beyond those stated in § 10(a)—and if so, which ones.

**i. "Irrationality" and "manifest disregard of the law."** Although *UHC Management Company* might seem to suggest that statutory grounds are the only ones available for judicial review of arbitration awards in the Eighth Circuit, *see UHC Management Co.,* 148 F.3d at 997–98, the Eighth Circuit Court of Appeals has elsewhere considered review standards beyond those listed in sections 10 and 11 of the FAA. For example, in *Val–U Construction Company v. Rosebud Sioux Tribe,* 146 F.3d 573 (8th Cir.1998), the court began, as it had in *UHC Management Company,* 148 F.3d at 998, by noting that " '[j]udicial review of an arbitration award is extremely limited.' " *See Val–U Constr. Co.,* 146 F.3d at 578 (quoting *Kiernan,* 137 F.3d at 594). However, the court continued, " 'Beyond the grounds for vacation provided in the FAA, an award will only be set aside where "it is completely irrational or evidences a manifest disregard for the law." ' " *Id.* at 578 (quoting *Kiernan,* 137 F.3d at 594, in turn quoting *Lee v. Chica,* 983 F.2d 883, 885 (8th Cir.), *cert. denied,* 510 U.S. 906, 114 S.Ct. 287, 126 L.Ed.2d 237 (1993), with quotation marks and citations omitted, as in *Val–U Constr. Co.*). In *Val–U Construction Company,* the Eighth Circuit Court of Appeals first found that none of the statutory grounds for vacation applied. *Id.* at 579. The

court then observed that "[w]e cannot say that the arbitration award is completely irrational or evidences a manifest disregard for the law." *Id.* Thus, as this court reads *Val–U Construction Company,* "irrationality" and "manifest disregard of the law" are separate, additional, extra-statutory grounds for vacation of an arbitration award in this circuit, not merely shorthand formulations of the review on the basis of the § 10(a) factors. This reading appears to be confirmed by *Stroh Container Company,* the seminal case in this circuit on review of arbitration awards, in which the court treated "irrationality" and "manifest disregard of the law" as criteria separate from and in addition to statutory factors. *See Stroh Container Co.,* 783 F.2d at 749 ("There is simply no suggestion in the findings made by the arbitrators on the procedural arbitrability question that they expressly flouted the law in reaching their decision or otherwise acted irrationally. Nor are any of the bases for judicial action enumerated in sections 10 and 11 met here. *See* 9 U.S.C. §§ 10, 11.").

In *Stroh Container Company,* the court explained that "irrationality" means that the arbitration award "fails to draw its 'essence' from the agreement, or contravenes a deeply rooted public policy." *Stroh Container Co.,* 783 F.2d at 749–750 (internal citations omitted); *see also Homestake Mining Co. v. United Steelworkers of Am., AFL—CIO,* 153 F.3d 678, 680–81 (8th Cir.1998) (reviewing arbitration of a collective bargaining agreement under the "irrationality" and "manifest disregard" standards articulated in *Lee,* 983 F.2d at 885, and *Stroh Container Co.,* 783 F.2d at 750, and considering violation of public policy as part of the "irrationality" review). Other Circuit Courts of Appeals have also recognized "irrationality" as a ground for review of an arbitration award

eral Arbitration Act, 9 U.S.C. § 1, *et seq.,* we can only disturb an arbitration award on the grounds set out in that Act."); *McIlroy v. PaineWebber, Inc.,* 989 F.2d 817, 820 n. 2 (5th Cir.1993) (rejecting any extra-statutory grounds for vacating arbitration awards); *see*

*also Montes v. Shearson Lehman Bros., Inc.,* 128 F.3d 1456, 1460–61 (11th Cir.1997) (noting that the Fifth Circuit Court of Appeals stands alone in this regard, and noting one exception).

under the FAA. *See Apex Plumbing Supply,* 142 F.3d at 193–94 & n. 5 (decision of the Eleventh Circuit Court of Appeals stating, "An arbitration award will not be set aside unless it is irrational or evidences manifest disregard for law," relying on the decision of the Fourth Circuit Court of Appeals in *Upshur Coals Corp. v. United Mine Workers of America, Dist. 31,* 933 F.2d 225, 229 (4th Cir.1991), but concluding that the arbitrator did not "irrationally" disregard exclusions in the contract or make an improper valuation of items under the contract, because he relied on, among other evidence, the expert testimony of a certified public accountant on the question of inventory valuation); *Lapine Tech. Corp. v. Kyocera Corp.,* 130 F.3d 884, 888 (9th Cir.1997) ("It is beyond peradventure that in the absence of any contractual terms regarding judicial review, a federal court may vacate or modify an arbitration award only if that award is 'completely irrational,' exhibits a 'manifest disregard of law,' or otherwise falls within one of the grounds set forth in 9 U.S.C. §§ 10 or 11.").

In *Kiernan v. Piper Jaffray Companies, Inc.,* 137 F.3d 588 (8th Cir.1998), the Eighth Circuit Court of Appeals explained "manifest disregard of the law," the other extra-statutory ground for review expressly recognized in this Circuit, as follows:

> Under this standard, arbitrators' interpretation of the law is insulated from review, but when they "understand and correctly state the law but proceed to disregard" it, manifest disregard may be shown. *Stroh Container Co. v. Delphi Indus., Inc.,* 783 F.2d 743, 750 (8th Cir. 1986) (internal quotation marks and citations omitted). The Kiernans assert only that the "panel was unversed in the niceties of the burden of proof in civil rights actions," not that the panel knew the applicable legal standards and consciously chose to disregard them. Even though the panel did not discuss whether Piper Jaffray had met its burden of producing evidence that Kiernan could

not perform the essential functions of an investment executive even with reasonable accommodation, it correctly placed the ultimate burden of persuasion on Kiernan to show that he suffered unlawful discrimination. *See Benson [v. Northwest Airlines, Inc.],* 62 F.3d [1108,] 1112 [ (8th Cir.1995) ] (citing *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 516, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993)). Regardless of the wisdom of the panel's conclusion, it in no way demonstrates a manifest disregard for the law warranting vacation of the arbitration award in this case.

*Kiernan,* 137 F.3d at 594–95.

"Manifest disregard of the law" appears to be a well-settled ground for vacation of or refusal to confirm an arbitration award in other circuits as well as this one, *see, e.g., P & P Indus., Inc. v. Sutter,* 179 F.3d 861, 870 (10th Cir.1999); *Weaver v. Florida Power & Light Co.,* 172 F.3d 771, 774–75 n. 9 (11th Cir.1999); *Gallus Inv., L.P. v. Pudgie's Famous Chicken, Ltd.,* 134 F.3d 231, 233–34 (4th Cir.1998) (recognizing scrutiny on statutory grounds stated in § 10(a), "and scrutiny for whether the award evinces a 'manifest disregard' of applicable law"), and it has been recognized by the United States Supreme Court. *See First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 942, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). Indeed, as the Eleventh Circuit Court of Appeals has pointed out, "every other circuit except the Fifth (which has declined to adopt any non-statutory grounds for vacating arbitration awards), has expressly recognized that 'manifest disregard of the law' is an appropriate reason to review and vacate an arbitration panel's decision." *Montes v. Shearson Lehman Bros., Inc.,* 128 F.3d 1456, 1460–61 (11th Cir.1997) (citing cases so holding, and expressly adopting "manifest disregard of the law," but distinguishing it from mere errors of law by the arbitrators, which are not grounds for vacation). However, still other extra-statu-

tory grounds have also been identified by the Circuit Courts of Appeals.

### ii. Arbitrariness and contravention of public policy.

Other extra-statutory standards have been articulated, for example, by the Eleventh Circuit Court of Appeals. That court will consider three extra-statutory grounds for vacation of an arbitration award, in addition to the grounds stated in § 10 of the FAA:

> In the Eleventh Circuit, a party may challenge an arbitration award without reliance on the FAA if the award is: (1) arbitrary and capricious; (2) in contravention of public policy; or (3) entered in "manifest disregard of the law." *See Montes v. Shearson Lehman Bros., Inc.,* 128 F.3d 1456 (11th Cir.1997) (describing the first two grounds and adopting the third).

*Scott v. Prudential Securities, Inc.,* 141 F.3d 1007, 1017 (11th Cir.1998). Some of the extra-statutory grounds recognized by the Eleventh Circuit Court of Appeals overlap those recognized by the Eighth Circuit Court of Appeals: Both the Eighth and Eleventh Circuit Courts of Appeals recognize "manifest disregard of the law" as an extra-statutory ground for judicial review of an arbitration award; and, although the Eleventh Circuit Court of Appeals apparently treats "contravention of public policy" as a separate ground to vacate an arbitration award, contravention of public policy is encompassed within the "irrationality" standard in the Eighth Circuit Court of Appeals, as that standard was explained in *Stroh Container Company. See Stroh Container Co.,* 783 F.2d at 749–50 ("irrationality" means that the arbitration award "fails to draw its 'essence' from the agreement, or contravenes a deeply rooted public policy").

Thus, the additional ground entertained by the Eleventh Circuit Court of Appeals is consideration of whether the arbitrators' decision is "arbitrary and capricious." *See Scott,* 141 F.3d at 1017. The Eleventh Circuit Court of Appeals has explained that an arbitration award is "arbitrary and capricious" only if " 'a ground for the arbitrator's decision can[not] be inferred from the facts of the case.' " *Id.* (quoting *Raiford v. Merrill Lynch, Pierce, Fenner & Smith,* 903 F.2d 1410, 1413 (11th Cir. 1990)). At first glance, there appears to be no meaningful distinction, beyond mere choice of words, between the "arbitrary and capricious" review of the Eleventh Circuit Court of Appeals and the "irrationality" review recognized in the Eighth Circuit Court of Appeals, at least if "irrationality" review encompasses the inferences to be drawn from the evidence or facts as well as from the terms of an agreement, as it does in other circuits. *Compare Stroh Container Co.,* 783 F.2d at 749–750 ("irrationality" means that the arbitration award "fails to draw its 'essence' from the agreement, or contravenes a deeply rooted public policy") (internal citations omitted), *with Apex Plumbing Supply,* 142 F.3d at 193–94 & n. 5 (reviewing factual determinations under the "irrationality" standard, by noting that an arbitrator's valuation of inventory was not "irrational," because it was founded on expert testimony of a certified public accountant).

Nonetheless, the Eighth Circuit Court of Appeals has expressly rejected "arbitrary and capricious" review of arbitration awards. *See Alvey, Inc. v. Teamsters Local Union No. 688,* 132 F.3d 1209, 1212 (8th Cir.1997) ("We reject the 'arbitrary and capricious' standard of review urged by Alvey. That standard governs appeals under the Administrative Procedure Act, *see* 5 U.S.C. § 706(2)(A), not the Federal Arbitration Act, *see* 9 U.S.C. § 10."). This court notes that a specific sort of arbitrariness was asserted in *Alvey:* The party challenging the arbitration award asserted that the award was "arbitrary and capricious," because it required that party, an employer, to prove an employee guilty of violating a company rule beyond "sufficient doubt," relying on a case holding that it was improper to import a criminal standard of proof "beyond a reasonable doubt" into the employer-employee context. *See*

*Alvey, Inc.*, 132 F.3d at 1212. The Eighth Circuit Court of Appeals found first that the arbitrator had expressly stated that he was not applying a "reasonable doubt" standard of proof. *Id.* The court then stated that "[u]nless there is specific controlling language in the collective bargaining agreement, we agree with the Eleventh Circuit that '[a]n arbitrator's decision allocating the burden of proof among the parties or in fixing the legal framework for evaluation of a grievance ordinarily cannot be reviewed in federal court.'" *Id.* (quoting *Sullivan, Long & Hagerty, Inc. v. Local 559 Laborers' Int'l Union*, 980 F.2d 1424, 1429 (11th Cir.1993)). This conclusion may appear to narrow the court's rejection of the "arbitrary and capricious" standard to the circumstances presented, that is, rejection of the applicability of an "arbitrary and capricious" standard to determinations of the allocation of the burden of proof or the legal framework for decision. However, in light of the broad language the appellate court used in *Alvey* to exclude "arbitrary and capricious" review under the FAA, *see Alvey, Inc.*, 132 F.3d at 1212 ("arbitrary and capricious" is a standard that "governs appeals under the [APA], not the [FAA]"), this court must nevertheless conclude that "arbitrary and capricious" review of arbitration awards under the FAA is not generally available in this circuit.[10]

This conclusion leads the court to the further conclusion that the "irrationality" review specifically authorized in this circuit, *see, e.g., Val–U Constr. Co.*, 146 F.3d at 578; *Kiernan*, 137 F.3d at 594; *Stroh Container Co.*, 783 F.2d at 749–750, is a more restrictive standard of review than "arbitrary and capricious" review. Indeed, the standard in this circuit is usually stated as "complete" irrationality, suggesting an extreme error with a complete lack of foundation. *See id.; Kiernan*, 137 F.3d at

594; *Stroh Container Co.*, 783 F.2d at 749–750. Such a restrictive standard of "irrationality" review would be in keeping with the principle that judicial review of arbitration awards is "limited" or "narrow," and an arbitration award cannot be overturned simply because the court would have interpreted the agreement differently, or because the arbitrators erred in interpreting the law or in determining the facts. *See, e.g., UHC Management Co.*, 148 F.3d at 998.

***iii. Fundamental unfairness.*** In its prior ruling on Cargill's motion to compel arbitration, this court suggested that yet another ground for review of arbitration awards may be appropriate. *See Hoffman*, 968 F.Supp. at 474–75. This court made a preliminary exploration of the question of its power to review an arbitration award on the basis of the "fundamental unfairness" of the proceedings. *Id.* This court observed,

> The Tenth Circuit Court of Appeals recently observed that "[c]ourts have created a basic requirement that an arbitrator must grant the parties a fundamentally fair hearing." *Bowles Fin. Group, Inc.*, 22 F.3d [1010,] 1012 [(10th Cir.1994)] (citing *Burchell v. Marsh*, 58 U.S. (17 How.) 344, 349, 15 L.Ed. 96 (1854)); *see also Employers Ins. v. National Union Fire Ins. Co.*, 933 F.2d 1481, 1491 (9th Cir.1991) (concluding that although a party did not receive a "perfect hearing," the party did receive a fair hearing); *Ficek v. Southern Pac. Co.*, 338 F.2d 655, 657 (9th Cir.1964), *cert. denied*, 380 U.S. 988, 85 S.Ct. 1362, 14 L.Ed.2d 280 (1965) (noting court may decline to recognize an arbitration award if the arbitration proceedings do not provide *inter alia* a "full and fair hearing"); *Areca, Inc. v. Oppenheimer & Co.*, 960

---

**10.** An exception may be presented in circumstances in which the parties have specified such review in their arbitration agreement. *See Alvey, Inc.*, 132 F.3d at 1212 (rejecting review of an arbitrator's allocation of the burden of proof or fixing the legal framework for evaluation of a grievance "[u]nless there is specific controlling language in the collective bargaining agreement").

F.Supp. 52, 55 (S.D.N.Y.1997) (concluding parties were not denied a "fundamentally fair hearing"). The absence of a fair hearing may constitute a fifth ground, in addition to the four statutory protections set out in 9 U.S.C. § 10, for vacating an arbitration award. *See McMahan & Co. v. Dunn Newfund I, Ltd.*, 230 A.D.2d 1, 656 N.Y.S.2d 620, 621 (1997) (citing *Bowles Fin. Group*, 22 F.3d at 1012–13).

*Hoffman*, 968 F.Supp. at 474–75.

The Tenth Circuit Court of Appeals has since reiterated its recognition of "fundamental fairness" of proceedings as a separate, extra-statutory ground for judicial review of an arbitration in *P & P Indus., Inc. v. Sutter Corp.*, 179 F.3d 861 (10th Cir.1999). In that decision, the Tenth Circuit Court of Appeals wrote,

> We have stated that "[a] court may only vacate an arbitration award for reasons enumerated in ... § 10, or for a handful of judicially created public policy reasons." *Denver & Rio Grande Western R.R. Co. v. Union Pac. R.R. Co.*, 119 F.3d 847, 849 (10th Cir.1997). Section 10 allows vacation of an arbitration award only where (1) the award was procured by corruption, fraud or undue means; (2) there was evident partiality or corruption on the part of the arbitrators; (3) the arbitrators were guilty of misconduct; or (4) the arbitrators exceeded or imperfectly executed their powers. *See* 9 U.S.C. § 10(a). *In addition to these statutory grounds for vacation, courts have on occasion vacated arbitration awards which violate public policy, were based on a manifest disregard of the law, or were arrived at without a fundamentally fair hearing.* *See Denver & Rio Grande*, 119 F.3d at 849 (citing cases).

*P & P Indus., Inc.*, 179 F.3d at 870 (emphasis added).

Other courts have also embraced "fundamental unfairness" of proceedings as a criterion in judicial review of arbitration awards, although "fundamental unfairness" is sometimes read as a standard for determining whether *statutory* failings, such as misconduct falling under statutory standards in § 10(a), are sufficiently severe to warrant judicial intervention. *See, e.g., Trans Chem. Ltd. v. China Nat'l Machinery*, 161 F.3d 314, 319 (5th Cir.1998) (*per curiam*) (adopting the district court's decision at 978 F.Supp. 266 (S.D.Tex.1997), in which the district court construed the question to be "whether the arbitration proceedings were 'fundamentally fair,'" but evaluated fundamental fairness solely on the basis of the statutory grounds, because the district court observed that "[j]udicial review of arbitrators' decisions is 'extraordinarily narrow' under the FAA; it is limited to the statutory exceptions enumerated in the FAA," 978 F.Supp. at 303); *Gallus Inv., L.P.*, 134 F.3d at 234 (rejecting a party's challenge to an arbitration award on the denial of its "right to a 'fundamentally fair hearing' and 'due process,'" concluding no constitutional claim was implied, the challenge did not clearly fit within a statutory ground, that "[w]ithout greater specificity, this argument is more rhetorical than real," and finding that, even if the conduct alleged might be so "fundamentally unfair" as to violate § 10, there was no actual violation in that case); *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir.1997) (concluding that judicial "review is restricted to determining whether the procedure was fundamentally unfair," but noting that "[c]ourts have interpreted section 10(a)(3) to mean that except where fundamental fairness is violated, arbitration determinations will not be opened up to evidentiary review," and "although not required to hear all the evidence proffered by a party, an arbitrator must give each of the parties to the dispute an adequate opportunity to present its evidence and argument") (internal quotation marks and citations omitted); *Teamsters Local 312 v. Matlack, Inc.*, 118 F.3d 985, 995 (3d Cir.1997) (noting that in its prior precedent, it had allowed a court to vacate an arbitration award under

§ 10(c) (now § 10(a)(3)) if the arbitrator's refusal to hear proffered testimony so affected the rights of a party that it may be said that the party was deprived of a fair hearing, or if the party has not been given notice and an opportunity to present arguments and evidence on the merits of the dispute); *Gulf Coast Indus. Workers Union v. Exxon Co., USA,* 70 F.3d 847, 850 (5th Cir.1995) (positing that the question addressed on judicial review of an arbitration award is "whether the arbitration proceedings were fundamentally fair," but making such a determination only on the basis of grounds set out in the FAA).

Whatever the scope of the "fundamental unfairness" review, it is plain that all of the courts to entertain such a ground for review look only to the "fundamental unfairness" of the *proceedings,* not the "fundamental unfairness" of any determination or award by the arbitration panel. *See P & P Indus., Inc.,* 179 F.3d at 870 (considering whether the challenging party received "a fundamentally fair hearing"); *Trans Chem. Ltd. v. China Nat'l Machinery,* 161 F.3d at 319 (adopting the district court's decision, which stated the standard as be "whether the arbitration proceedings were 'fundamentally fair,' " 978 F.Supp. at 303); *Tempo Shain Corp.,* 120 F.3d at 20 (concluding that judicial "review is restricted to determining whether the procedure was fundamentally unfair"); *Gulf Coast Indus. Workers Union,* 70 F.3d at 850 (the question addressed on judicial review of an arbitration award is "whether the arbitration proceedings were fundamentally fair").

Although the Eighth Circuit Court of Appeals has never formally recognized "fundamental unfairness" as an extra-stat-utory ground for judicial review of an arbitration award, it has not specifically rejected such review, as it has "arbitrary and capricious" review. *See Alvey, Inc.,* 132 F.3d at 1212 (rejecting "arbitrary and capricious" review of arbitration awards). Furthermore, this court does not believe a "fundamental unfairness" standard is inimical to the standards of review the Eighth Circuit Court of Appeals has adopted. Finally, at least one other Circuit Court of Appeals has recognized "fundamental unfairness" of the proceedings as an independent ground for judicial review of arbitration awards. *See, e.g., P & P Indus., Inc.,* 179 F.3d at 870. Therefore, this court will consider such a ground for review here.

### 2. Application of the standards

Having identified the standards applicable to judicial review of arbitration awards in this and other circuits, the court will now undertake a review of the arbitration award in question here against both statutory and extra-statutory standards. However, the court must first identify Hoffman's specific challenges to the arbitration award in this case, and determine under which standard each challenge appears to fall.[11] In his Prehearing Submission, Hoffman identified five grounds or "issues" that he asserts warrant vacation (or denial of confirmation) of the arbitration award in this case. At the hearing on confirmation or vacation of the arbitration award, he added one further ground.

#### a. Hoffman's challenges

Hoffman's first "issue" attacks document production and subpoenas that the NGFA refused to authorize. Specifically, he asserts that the evidence shows that he requested that the NGFA authorize the is-

---

**11.** The court is hampered in these preliminary determinations by Hoffman's failure to identify specifically the grounds upon which each of his challenges relies. In support of his various challenges to the arbitration award, Hoffman cites broadly *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995), without specifying any part of the opinion as support-ing any specific assertion, sections 9 and 10 of the FAA in their entirety, or the entire FAA. Despite this poorly focused citation of legal authority, more specific legal, support for Hoffman's challenges to the arbitration award can be gleaned from the nature of his arguments and his identification of facts he believes support his position.

suance of subpoenas that would be enforceable in courts in Iowa and Nebraska, but that the NGFA refused to permit this procedure. Indeed, NGFA arbitration rules do not provide for issuance of subpoenas or any other discovery in arbitration proceedings. Consequently, Hoffman contends that he could not produce for deposition or hearing persons not under his control, which included most of the pertinent witnesses, and that the prejudice to his ability to present his case was not lessened by depositions of Cargill employees that Cargill voluntarily provided. Furthermore, he asserts that document review voluntarily permitted by Cargill was so restrictive—particularly in Cargill's refusal to allow him the assistance of an expert to review the mountain of undifferentiated documents provided and other assertions of privilege—that his case was prejudiced. This appears to the court to be a challenge founded to some extent on 9 U.S.C. § 10(a)(3), which concerns the arbitrators' misconduct or refusal to hear material evidence, and to some extent upon an assertion of "fundamental unfairness" of proceedings. *See P & P Indus., Inc.,* 179 F.3d at 870 (recognizing review for "fundamental unfairness" of the proceedings as an independent, extra-statutory ground).

■ Hoffman's second challenge is based on the legal standards before the arbitration panel. He asserts that the arbitration panel ignored specific NGFA rules and state and federal statutes that were purportedly applicable to Cargill's conduct. Such a challenge is, at first blush, merely an assertion that the arbitration panel committed a legal error, which is not generally a cognizable ground for judicial review of an arbitration award, *see UHC Management Co.,* 148 F.3d at 998 ("'We may not set an award aside simply because . . . the arbitrators erred in interpreting the law or in determining the facts.'") (quoting *Stroh Container Co.,* 783 F.2d at 751), and is not cognizable here, because there was no agreement to judicial

review of legal determinations. *See Alvey, Inc.,* 132 F.3d at 1212 (rejecting review of an arbitrator's determination of the legal framework for evaluation of a grievance "[u]nless there is specific controlling language in the collective bargaining agreement"). However, the court will consider whether Hoffman has demonstrated that the arbitration award is in "manifest disregard of the law." *See Val–U Constr. Co.,* 146 F.3d at 578 (recognizing such a ground for judicial review of arbitration awards in this circuit); *Kiernan,* 137 F.3d at 594 (same). Furthermore, part of Hoffman's second challenge stands on yet another ground. He also asserts that the arbitration panel's legal and factual determinations that "no load shortages occurred," because the State of Nebraska never formally charged Cargill with violations relating to the scales at the Blair facility, are simply absurd. This argument is at least cognizable as an "irrationality" challenge. *See Val–U Constr. Co.,* 146 F.3d at 578 (arbitration awards may be reviewed for "irrationality"); *Kiernan,* 137 F.3d at 594 (same); *Stroh Container Co.,* 783 F.2d at 749–750 (same); *see also Apex Plumbing Supply,* 142 F.3d at 193–94 & n. 5 (reviewing factual determinations under the "irrationality" standard).

■ As his third "issue," Hoffman challenges the arbitration award on the ground of "partiality," as demonstrated by the panel's legal conclusion that grain and scale laws can only be enforced by law enforcement officials, not by farmers in arbitration. Hoffman asserts that "partiality" is apparent, because the panel purportedly ignored uncontested evidence that the Blair scales were not operated correctly on various occasions by Cargill personnel, and purportedly imposed its view of what settlement of the dispute would be reasonable without regard to Cargill's violations of laws and NGFA rules. At the evidentiary hearing before this court, Hoffman also asserted that "partiality" was inherent in the make up of the arbitration panel, because all three

members were drawn from the grain buying side of the industry, with no representation by farmers. Running through Hoffman's argument in support of his third "issue" is an assertion that he was prejudiced in his ability to present his case by Cargill's refusal to produce certain evidence, its production of an undifferentiated mass of documents many or most of which were simply not relevant, Hoffman's inability to compel production through the arbitration panel or NGFA procedures, and Cargill's refusal to allow him to use an expert to evaluate the documents voluntarily produced. To a large extent, the court reads this third objection to be an invitation to the court to re-try the contentions of the parties before the arbitration panel and to make anew all factual and legal determinations. This the court is not permitted to do, under any standard applicable to judicial review of an arbitration award. *See UHC Management Co.*, 148 F.3d at 998 (" 'We may not set an award aside simply because ... the arbitrators erred in interpreting the law or in determining the facts.' ") (quoting *Stroh Container Co.*, 783 F.2d at 751). This third challenge is nonetheless partially cognizable, but only to the extent it can be read as an assertion that there was evident partiality or corruption in the arbitrators, a statutory ground under 9 U.S.C. § 10(a)(2), as a claim of misconduct by the arbitrators in refusing to hear evidence or to provide a reasonable opportunity to present evidence, another statutory ground under 9 U.S.C. § 10(a)(3), or as an extra-statutory challenge to the "fundamental fairness" of the proceedings. *See P & P Indus., Inc.*, 179 F.3d at 870 (recognizing review for "fundamental unfairness" of the proceedings as an independent, extra-statutory ground).

Hoffman's fourth challenge is to the denial of his appeal of the arbitration award. Hoffman contends that the requirement in the NGFA rules that he pay the entire award by certified check to be held by the NGFA secretary prior to appealing only allows the wealthy and financially liquid to use the NGFA's arbitration appeals system. This challenge can only be construed as a challenge to the "fundamental fairness" of the NGFA arbitration process. *See P & P Indus., Inc.*, 179 F.3d at 870 (recognizing review for "fundamental unfairness" as an independent, extra-statutory ground).

As his fifth challenge, Hoffman asserts that many Cargill employees testified falsely that the scales at Cargill's Blair facility could not print a weight ticket while grain was being unloaded. Hoffman asserts that only after the hearing did he discover internal Cargill documents demonstrating that Cargill knew such false weights could be obtained before State of Nebraska officials proved the point. He contends further that he submitted this information to the NGFA after the hearing, but that such evidence was either never forwarded to the arbitrators by NGFA officials or ignored by the arbitrators in their decision. Finally, he asserts that, had adequate discovery procedures been in place under NGFA arbitration rules, he would have been able to produce such evidence at the arbitration hearing. Whether or not the Cargill witnesses testified falsely is not a question this court can answer on judicial review, nor can this court decide that the arbitrators erred in concluding that Cargill employees did not lie, because this court " 'may not set an award aside simply because ... the arbitrators erred in ... determining the facts.' " *UHC Management Co.*, 148 F.3d at 998 (quoting *Stroh Container Co.*, 783 F.2d at 751). However, this court can properly consider whether the arbitration proceedings improperly precluded Hoffman from discovering or presenting the pertinent evidence that would have impeached the truthfulness of the Cargill employees' testimony, pursuant to either 9 U.S.C. § 10(a)(3) or the extra-statutory "fundamental unfairness" standard. *See P & P Indus., Inc.*, 179 F.3d at 870 (recognizing review for "fundamental unfairness"

as an independent, extra-statutory ground).

The preceding five challenges were articulated in Hoffman's "prehearing submission." However, in addition to presenting evidence on these matters, at the hearing on confirmation or vacation of the arbitration award, Hoffman also asserted that the arbitrators improperly denied his motion to postpone the arbitration and that he was prejudiced thereby. This sixth challenge is clearly cognizable under 9 U.S.C. § 10(a)(3).

Having determined the basic legal framework against which Hoffman's challenges must be judged, the court turns next to consideration of each of those challenges.

### b. Hoffman's statutory challenges

As construed above, the court finds that Hoffman has made two kinds of statutory challenges to the arbitration award in question here: (1) he makes challenges pursuant to 9 U.S.C. § 10(a)(2), on the grounds of "partiality"; and (2) he makes various challenges pursuant to § 10(a)(3), concerning discovery procedures and hearing of evidence. The court observes that these challenges go to both the general nature of NGFA arbitration procedures, and to the procedures specifically employed in the arbitration in question here.

### i. Section 10(a)(2) "partiality" challenges.

Hoffman has made a "facial" or "institutional" challenge—as it were—to NGFA arbitration on "partiality" grounds, pointing to the process for selection of arbitrators under NGFA arbitration rules.

He has also made an "as applied" partiality challenge here, pointing to the composition of the panel of arbitrators in his case and their alleged imposition of a resolution they deemed fair, but which was more favorable to the grain buyer, without regard to applicable statutes or rules. Section 10(a)(2) provides that the court "may make an order vacating the award upon the application of any party to the arbitration ... [w]here there was evident partiality or corruption in the arbitrators, or either of them." 9 U.S.C. § 10(a)(2). The Eighth Circuit Court of Appeals has had little opportunity to consider what standards are generally applicable to a "partiality" challenge under § 10(a)(2). *See Kiernan*, 137 F.3d at 593 (the challenging party had waived any partiality challenge under § 10(a)(2));[12] *Olson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 51 F.3d 157, 159 (8th Cir.1995) (considering the narrow question of whether nondisclosure or insufficient disclosure of business relationships one arbitrator had with one of the parties was sufficient to establish a § 10(a)(2) challenge).

More generally applicable standards for a challenge under § 10(a)(2) have been articulated by other Circuit Courts of Appeals. The party seeking vacation of an arbitration award pursuant to § 10(a)(2) bears the burden of proving "that a reasonable person would have to conclude that an arbitrator was partial to the other party to the arbitration." *ANR Coal Co., Inc. v. Cogentrix of N.C., Inc.*, 173 F.3d 493, 500 (4th Cir.1999) (internal quotation marks and citation omitted); *accord The*

---

12. Although Cargill argues, in part, that Hoffman waived challenges to the partiality of the arbitrators by stipulating that he had no objection to them at the beginning of the arbitration hearing, the court finds that *Kiernan* is distinguishable. In this case, Hoffman asserted his claim of "institutional" partiality of arbitration panel in his resistance to Cargill's motion to compel arbitration, on the ground that a panel constituted as required under NGFA rules was incapable of being impartial, because it would be comprised of "grain executives." This court found, at that time, that

Hoffman had made no showing on the record to support his speculation that the arbitration panel would be partial or that the safeguards provided in the NGFA rules would be inadequate to prevent potential bias. *Hoffman*, 968 F.Supp. at 474. The court then remarked, "Of course, Hoffman remains free to reassert this complaint post-arbitration if necessary. *See* 9 U.S.C. § 10(a)(2)." *Id.* Hoffman's reassertion of his "institutional" and specific partiality challenges now is simply in conformity with this court's prior ruling.

*Andersons, Inc.*, 166 F.3d at 325 ("Under th[e] ["evident partiality"] test, evident partiality will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration.") (internal quotation marks and citations omitted). The Fourth Circuit Court of Appeals has identified four factors a court should examine to determine if the claimant has demonstrated "evident partiality": (1) the extent and character of the personal interest, pecuniary or otherwise, of the arbitrator in the proceeding; (2) the directness of the relationship between the arbitrator and the party he is alleged to favor; (3) the connection of that relationship to the arbitration; and (4) the proximity in time between the relationship and the arbitration proceeding. *Id.* Furthermore, when evaluating facts in light of these factors, the court should "determine whether the asserted bias is direct, definite and capable of demonstration rather than remote, uncertain or speculative and whether the facts are sufficient to indicate improper motives on the part of the arbitrator." *Id.*; *The Andersons, Inc.*, 166 F.3d at 329 ("The alleged partiality must be direct, definite, and capable of demonstration, and the party asserting evident partiality must establish specific facts that indicate improper motives on the part of the arbitrator.") (internal quotation marks and citations omitted); *Gianelli Money Purchase Plan & Trust v. ADM Inv. Servs., Inc.*, 146 F.3d 1309, 1312 (11th Cir.) (same), *cert. denied*, —— U.S. ——, 119 S.Ct. 540, 142 L.Ed.2d 449 (1998). However, "[a] party need not prove that the arbitrator, in fact, had improper motives," as to do so "would make the standard for evident partiality equivalent to proving actual bias." *Id.* at 500–01 (internal quotation marks and citations omitted); *The Andersons, Inc.*, 166 F.3d at 325 (the "evident partiality" test "is a higher standard

than an 'appearance of bias,' but requires a lesser showing than 'actual bias' "). What is required is that the challenging party "put forward facts that objectively demonstrate such a degree of partiality that a reasonable person could assume that the arbitrator had improper motives." *Id.* at 501; *accord Scott*, 141 F.3d at 1007 ("the moving party must present evidence that would support a 'reasonable impression of partiality' on the arbitrator's behalf"). However, one Circuit Court of Appeals, that of the Eleventh Circuit, apparently construes "evident partiality" very narrowly, holding that an arbitration award may be vacated for "evident partiality" of an arbitrator "only when either (1) an actual conflict exists, or (2) the arbitrator knows of, but fails to disclose, information which would lead a reasonable person to believe that a potential conflict exists." *Gianelli Money Purchase Plan & Trust*, 146 F.3d at 1312; *but see Scott*, 141 F.3d at 1015–16 (another decision of the Eleventh Circuit Court of Appeals reflecting no such narrow construction of § 10(a)(2Q). All of these considerations seem to this court to be more useful to determining whether an individual arbitrator was "partial," than they are to determining whether "institutional" partiality existed. Nonetheless, to the extent they are applicable, the court will consider these standards on both Hoffman's "institutional" and "as applied" partiality challenges.

*Amicus* NGFA found it most urgent to respond to Hoffman's "institutional" partiality challenge. *Amicus* NGFA argues that its arbitration rules contain many procedural safeguards to ensure that farmers are adequately and sufficiently represented,[13] relying as well on the decision of the Sixth Circuit Court of Appeals in *The Andersons, Inc. v. Horton Farms*, 166

---

**13.** The procedural safeguards that *amicus* NGFA identified are (a) arbitrator disclosure and disclosure of bias or partiality; (b) express written, publicly available arbitration rules to govern the conduct of the arbitration; (c) mandatory, written opinions by a three member arbitration committee that adjudicates the dispute; (d) the ability to challenge an arbitration committee member for bias; (e) appeal rights prior to a NGFA arbitration award becoming final; and (f) review by the federal courts pursuant to the FAA.

F.3d 308 (6th Cir.1998), in which that court rejected a farmer's claim of unfairness and bias in the selection of arbitrators under NGFA rules. *Amicus* NGFA points out that not one arbitration award rendered by a NGFA arbitration committee has thus far been overturned by a court. It points further to seven recent arbitration decisions in favor of individual farmers and against grain buying institutions as demonstrating the lack of the specific kind of anti-farmer bias that Hoffman alleges. Such evidence of arbitration decisions favorable to individual farmers, however, is virtually meaningless when *amicus* NGFA has failed to indicate the total number of arbitration decisions to which these seven decisions favorable to individual farmers should be compared.

The NGFA arbitration rules provide for the formation of an arbitration panel ("committee") as follows:

### Formation of Committees

#### Section 4.

(a) Each National Arbitration Committee of three arbitrators shall be selected by the National Secretary and approved by the Chairman of the National Grain and Feed Association with respect to each case to be referred to said committee.

(b) These arbitrators shall be selected from the membership with a view to forming each committee of prominent people experienced in the type of trade involved in cases to be brought before it. To qualify as an arbitrator, a member should be commercially disinterested with respect to the particular dispute intended to be presented to him for judgment. If an individual arbitrator changes employment from one member firm to another member firm, the individual must continue to be commercially disinterested or be replaced.

NGFA Arbitration Rules, § 4(a) & (b) (*Amicus* NGFA's Exhibit 4 at 35). Thus, under the NGFA arbitration rules, the arbitrators are chosen from NGFA members by the NGFA national secretary and are approved by the NGFA chairman, not by the more typical method of each party selecting an arbitrator, and those two arbitrators in turn selecting a third arbitrator—a process that by its nature would tend to eliminate or cancel out the effect of any individual bias of a particular arbitrator. Although the persons making the selection of NGFA arbitrators under NGFA arbitration rules, the NGFA national secretary and chairman, are strangers to the specific dispute, and therefore presumably even-handed, they nonetheless are in turn selected by a specific constituency, the NGFA membership, possibly reflecting whatever "institutional" bias that organization may have. The NGFA selection process for arbitrators would therefore tend to reinforce any "institutional" bias that might already be present in the pool of arbitrators from the nature of their NGFA membership.

As *amicus* NGFA points out, however, in *The Andersons, Inc. v. Horton Farms*, 166 F.3d 308 (6th Cir.1998), the Sixth Circuit Court of Appeals did indeed recently reject an "institutional" partiality challenge to NGFA arbitration pursuant to § 10(a)(2) that is not unlike Hoffman's challenge here. The Sixth Circuit Court of Appeals ruled on the challenge as follows:

As an initial matter, we note that the district court correctly required Horton Farms to "submit evidence creating the reasonable impression that the present arbitrators were motivated by bias in their rendition of the award." Under *Apperson [v. Fleet Carrier Corp.*, 879 F.2d 1344 (6th Cir.1989), *cert. denied*, 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 533 (1990) ], the party seeking invalidation must demonstrate more than an amorphous institutional predisposition toward the other side; a lesser showing would be tantamount to an "appearance of bias" standard. Moreover, as alluded to in the previous section, it is undisputed that over 1000 businesses, which range from agri-businesses such

as The Andersons, to farmer-owned cooperatives, comprise the NGFA membership, and that the NGFA arbitration rules specifically require that arbitrators are selected from membership "with a view to forming each committee of prominent people experienced in the type of trade involved in the cases to be brought before it" and that the arbitrators chosen be commercially disinterested in the particular matter before them. We think that in light of these facts there can be no reasonable impression that the NGFA arbitration system itself is evidently partial. *Cf. Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 148–49, 150, 89 S.Ct. 337, 339, 340, 21 L.Ed.2d 301 (1968) (opinion of the Court and White, J. concurring) (noting that arbitrators cannot sever all ties with the business world and that in fact, it is because of their business acumen that they are effective). We disagree with Horton Farms' asserted distinction between small farms and large farmer-owned/controlled agricultural cooperatives. In the context of this case, the NGFA does not become a biased entity simply because smaller farms tend not to be members. Like their smaller counterparts, large farmer-owned cooperatives have a vested interest in preventing agri-businesses from unfairly enforcing grain delivery contracts.

*The Andersons, Inc.*, 166 F.3d at 329.

■ This court does not share the sanguine view of the Sixth Circuit Court of Appeals that large farmer-owned cooperatives have the same interests in fair enforcement of grain delivery contracts as smaller farms. To the contrary, the substantial amount of litigation between farmer-owned cooperatives and individual farmers over enforcement of grain delivery contracts currently before this and other courts demonstrates the fallacy of such an assumption. The pertinent distinction is not size nor ownership, but whether the members of the NGFA are primarily grain buyers or both grain buyers and sellers, with respect to the position of individual farmers in the grain production and marketing business. It should be evident that an arbitration panel drawn from and composed entirely of grain buyers *vis-à-vis* individual farmers, as is the case when NGFA rules require that arbitrators be drawn from its members, at a minimum, raises an appearance of bias.

However, this court recognizes that neither "appearance of bias" nor "actual bias" is the applicable standard. *See ANR Coal Co., Inc.*, 173 F.3d at 500–01; *The Andersons, Inc.*, 166 F.3d at 325. Rather, Hoffman is required to show "facts that objectively demonstrate such a degree of partiality that a reasonable person could assume that the arbitrator had improper motives." *Id.* at 501; *accord Scott*, 141 F.3d at 1007. The court cannot find, even in light of the composition of the NGFA membership, and hence the composition of any NGFA arbitration panel drawn from that membership, that Hoffman has demonstrated institutional bias that is "direct, definite and capable of demonstration rather than remote, uncertain, or speculative." *Id.* at 500; *The Andersons, Inc.*, 166 F.3d at 329; *Gianelli Money Purchase Plan & Trust*, 146 F.3d at 1312. To put it another way, there is plenty of smoke, but Hoffman hasn't shown the court the fire.

■ To demonstrate that the specific arbitration committee that decided his case was biased—what this court described as his "as applied" challenge—Hoffman relies on his assertion that the arbitrators were in fact all executives on the grain buying side of the business and that they allegedly imposed a resolution they deemed fair, but which was more favorable to the grain buyer, without regard to applicable statutes or rules. This court finds the response of the Sixth Circuit Court of Appeals to a similar argument more persuasive than its observations on "institutional" bias: "An adverse award in and of itself is no evidence of bias absent some evidence of improper motiva-

tion." *The Andersons, Inc.*, 166 F.3d at 330; *accord Scott*, 141 F.3d at 1015–16 (assertion that an arbitration award was so unsupported by the law that it could only have been the product of partiality "precisely the vague, remote, and speculative charge that we have held cannot support an order to vacate an arbitration award"). Hoffman offers no such specific additional evidence of improper motivation of any member of his arbitration committee. This court will not review determinations of fact or law, except to the extent that they may demonstrate either "irrationality," *see Val–U Constr. Co.*, 146 F.3d at 578 (arbitration awards may be reviewed for "irrationality"); *Kiernan*, 137 F.3d at 594 (same); *Stroh Container Co.*, 783 F.2d at 749–750 (same); *see also Apex Plumbing Supply*, 142 F.3d at 193–94 & n. 5, or "manifest disregard of the law." *See Val–U Constr. Co.*, 146 F.3d at 578; *Kiernan*, 137 F.3d at 594–95. Such challenges are considered *infra*.

Thus, the court concludes that Hoffman's "partiality" challenges pursuant to 9 U.S.C. § 10(a)(2) are not sufficient to require denial of confirmation pursuant to 9 U.S.C. § 9. However, the court will return to the question of "institutional" bias in NGFA arbitration proceedings when it considers the "fundamental unfairness" of the arbitration proceedings at issue in the present case.

***ii. Section 10(a)(3) "misconduct" challenges.*** Next, the court turns to challenges cognizable under § 10(a)(3). That subsection of the FAA provides as follows:

[The reviewing court] may make an order vacating the award upon the application of any party to the arbitration . . . [w]here the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

9 U.S.C. § 10(a)(3). Hoffman has made a variety of challenges to confirmation of the arbitration award that the court has found are cognizable under § 10(a)(3). To summarize or categorize these challenges, they are (1) that the arbitrators refused to authorize the issuance of subpoenas that would be enforceable in courts in Iowa and Nebraska; (2) that the arbitrators improperly precluded Hoffman from discovering or presenting pertinent evidence that would have impeached the truthfulness of Cargill employees' testimony or otherwise have assisted him in proving his contentions, again by failing to compel discovery and the presence of witnesses; and (3) that the arbitrators unreasonably refused to postpone the arbitration hearing.

Taking this last challenge first, the court notes that the Eighth Circuit Court of Appeals considered the statutory ground of refusal to postpone an arbitration hearing found in 9 U.S.C. § 10(a)(3) in *DVC–JPW Investors v. Gershman*, 5 F.3d 1172, 1174 (8th Cir.1993). The court wrote,

If any reasonable basis exists for the arbitrators' decision not to postpone the hearing, we will not intervene. *See Schmidt v. Finberg*, 942 F.2d 1571, 1574–75 (11th Cir.1991). The record reveals an ample basis for the arbitrators' refusal to grant Gershman a second postponement. Therefore, the district court did not abuse its discretion when it concluded that the arbitrators' refusal to postpone the hearing was not misconduct.

*Gershman*, 5 F.3d at 1174. The "ample basis" for refusal to postpone the hearing a second time in *Gershman* was that the hearing had been rescheduled once, owing to a conflict in Gershman's schedule, to a date based upon submissions of the parties, with a warning that the new date would be "final," and a second postponement was refused when Gershman "subsequently developed a conflict to the new hearing dates." *Id.* at 1173.

■ The arbitration hearing in this case took place on July 28 and 29, 1998.

The hearing had already been continued from its original date, in February of 1998, at the request of the parties. The parties had specifically agreed to the July dates as mutually acceptable in light of their schedule for voluntary depositions and document exchange. Hoffman requested a further continuance of the July arbitration hearing, just weeks before the hearing was scheduled, apparently to accommodate further voluntary discovery. It was not unreasonable for the arbitrators to deny that request, in light of the prior rescheduling of the hearing to a date acceptable to Hoffman and the arbitrators' agreement to leave the record open for supplementation after the July hearing. Hoffman did in fact submit supplemental information, which undercuts any claim he may have that he was prejudiced by the failure of the arbitrators to reschedule the hearing. Thus, there was some "reasonable basis ... for the arbitrators' decision not to postpone the hearing," and under *Gershman*, this court should not now interfere with that decision. *See Gershman*, 5 F.3d at 1174.

■ Hoffman's other challenges pursuant to § 10(a)(3) have to do with the arbitrators' refusal to issue subpoenas or otherwise to permit or compel discovery. As was the case with § 10(a)(2), decisions of the Eighth Circuit Court of Appeals provide little guidance on the scope of § 10(a)(3). However, it is apparent both from the language of the statute and the decision of the Eighth Circuit Court of Appeals in *Sav–A–Trip, Inc. v. Belfort*, 164 F.3d 1137 (8th Cir.1999), that the complaining party must not only show some "misconduct" of the arbitrators, but that the complaining party was prejudiced thereby. *See* 9 U.S.C. § 10(a)(3) (the arbitrators must be guilty of one of the specified kinds of misconduct or "any other misbehavior by which the rights of any party have been prejudiced"); *Sav–A–Trip, Inc.*, 164 F.3d at 1139 (considering both whether the arbitrators improperly failed to consider a reply brief and wheth-

er the complaining party could demonstrate prejudice); *accord Scott*, 141 F.3d at 1017 ("Whether we consider this argument as a refusal to consider pertinent evidence or as 'other misbehavior,' under section 10(a)(3), we note that Scott must show that the arbitrators' refusal to permit him to participate by telephone caused him some prejudice.").

Again, decisions of other Circuit Courts of Appeals provide some further general guidance on what constitutes a sufficient challenge to confirmation of an arbitration award under § 10(a)(3). For example, the Eleventh Circuit Court of Appeals has observed that "a mere difference of opinion between the arbitrators and the moving party as to the correct resolution of a procedural problem will not support vacatur under section 10(a)(3)." *Scott*, 141 F.3d at 1018. Furthermore,

> An arbitrator need not consider all the evidence the parties seek to introduce but may reject evidence that is cumulative or irrelevant. *See Robbins [v. Day]*, 954 F.2d [679,] 685 [ (11th Cir. 1992) ]....
>
> As we observed in *Robbins*, the FAA permits arbitration to proceed "with only a summary hearing and with restricted inquiry into factual issues.... [The arbitrator] need only give each party *the opportunity* to present its arguments and evidence." 954 F.2d at 685 (emphasis added) (citations omitted). Although the arbitrators refused Scott's participation by telephone, the arbitrators did conduct a hearing, of which Scott had notice and the opportunity to attend, and they considered Scott's fifty-six page affidavit setting out his arguments and evidence. Accordingly, we find no misconduct on the part of the arbitrators and affirm the district court's decision not to vacate the arbitration award on the statutory grounds.

*Scott*, 141 F.3d at 1017. The Second Circuit Court of Appeals has stated similar standards, *see Tempo Shain Corp.*, 120 F.3d at 20, adding that "[i]n making evi-

dentiary determinations, an arbitrator 'need not follow all the niceties observed by the federal courts.'" *Id.* (quoting *Bell Aerospace Co. Div. of Textron v. Local 516, Int'l Union, United Auto., Aerospace & Agr. Implement Wkrs. of Am. (UAW),* 500 F.2d 921, 923 (2d Cir.1974)). The Seventh Circuit Court of Appeals has held that it is not "misconduct" under § 10(a)(3) for arbitrators to adhere to the rules the parties have agreed shall govern their arbitration proceedings. *Gingiss Int'l, Inc. v. Bormet,* 58 F.3d 328, 332–33 (7th Cir. 1995).

Here, the court finds that, even assuming Hoffman has made an adequate showing that his case before the arbitration panel was prejudiced by the panel's refusal to issue subpoenas or to provide for or compel discovery—which the court believes was the case—*see* 9 U.S.C. § 10(a)(3) (requiring that the misconduct asserted have prejudiced the claimant); *Sav–A–Trip, Inc.,* 164 F.3d at 1139 (same), he cannot show that the panel's refusal constituted a refusal to hear evidence or other misconduct within the meaning of § 10(a)(3). The parties agree that NGFA arbitration rules do not provide for the issuance of subpoenas or for any formal discovery or method of compelling discovery. Thus, this court cannot hold that it was misconduct within the meaning of § 10(a)(3) for NGFA arbitrators to refuse to do what the applicable arbitration rules did not authorize them to do. *See Gingiss Int'l, Inc.,* 58 F.3d at 332–33. This conclusion, however, will not preclude the court from revisiting the question of the adequacy of discovery or subpoena powers of the arbitrators under NGFA arbitration rules when it turns to the question of whether the arbitration proceedings were "fundamentally unfair."

Thus, the court concludes that Hoffman has failed to show that the arbitration award should not be confirmed on grounds stated in 9 U.S.C. § 10(a)(3).

### c. *Hoffman's extra-statutory challenges*

The court concluded above that the extra-statutory challenges to an arbitration award that the Eighth Circuit Court of Appeals has specifically authorized, or has not specifically excluded, are based on "irrationality," "manifest disregard of the law," and "fundamental unfairness." *See supra* beginning at p. 875. The court will consider the challenges the court has construed Hoffman to be making under each of these standards in turn.

*i. "Irrationality" challenge.* The court concluded above that Hoffman's assertion that the arbitration panel's legal and factual determination that "no load shortages occurred," because the State of Nebraska never formally charged Cargill with violations relating to the scales at the Blair facility, are simply absurd was at least cognizable as an "irrationality" challenge. *See Val–U Constr. Co.,* 146 F.3d at 578 (arbitration awards may be reviewed for "irrationality"); *Kiernan,* 137 F.3d at 594 (same); *Stroh Container Co.,* 783 F.2d at 749–750 (same); *see also Apex Plumbing Supply,* 142 F.3d at 193–94 & n. 5 (reviewing factual determinations under the "irrationality" standard). This court also noted that in *Stroh Container Company,* the Eighth Circuit Court of Appeals explained that "irrationality" means that the arbitration award "fails to draw its 'essence' from the agreement, or contravenes a deeply rooted public policy," *see Stroh Container Co.,* 783 F.2d at 749–750 (internal citations omitted), while at least one other Circuit Court of Appeals has recognized "irrationality" as a ground for review of factual determinations in an arbitration award under the FAA. *See Apex Plumbing Supply,* 142 F.3d at 193–94 & n. 5 (decision of the Eleventh Circuit Court of Appeals concluding that the arbitrator did not "irrationally" value items under the contract, because he relied on, among other evidence, the expert testimony of a certified public accountant on the question of inventory valuation). However, this

court also concluded, based on rejection by the Eighth Circuit Court of Appeals of "arbitrary and capricious" review and the court's statements that an arbitration decision must be "completely" irrational to be overturned, that "irrationality" is a restrictive standard of review suggesting an extreme error with a complete lack of foundation. *See Val–U Constr. Co.*, 146 F.3d at 578; *Kiernan,* 137 F.3d at 594; *Stroh Container Co.,* 783 F.2d at 749–750. Thus, "irrationality," to be in keeping with general restraints on judicial review of arbitration awards, does not permit the court to overturn an arbitration award simply because the court would have interpreted the agreement differently, or because the arbitrators erred in interpreting the law or in determining the facts. *See, e.g., UHC Management Co.,* 148 F.3d at 998.

■ Even applying such a restrictive standard of review here, the court concludes that the challenged determination of the arbitrators is indeed "completely irrational," that is, completely without foundation. *See Val–U Constr. Co.,* 146 F.3d at 578; *Kiernan,* 137 F.3d at 594; *Stroh Container Co.,* 783 F.2d at 749–750; *accord Apex Plumbing Supply,* 142 F.3d at 193–94 & n. 5. First, the record before the arbitrators made it abundantly clear that, contrary to the testimony of Cargill witnesses, "short" weights could be and were obtained on the scales at Cargill's Blair facility; that grain sellers other than Hoffman had also complained about "short" weights; that in a specific "test" on July 8, 1996, involving comparison of weights obtained on the Cargill scales and the Terra scales, one out of two of Hoffman's loads was weighed "short" by the

Cargill scales; and that State of Nebraska officials demonstrated that the scales could be operated improperly to obtain "short" weights and *required* corrective action, even if those state officials never formally charged Cargill with violations relating to the scales at the Blair facility. It is undeniable that proper weights were material to contracts to deliver grain, such that the arbitrators should have considered whether Cargill's failure to provide a proper weight on *any* occasion constituted a material breach by Cargill of any or all of Hoffman's contracts. Furthermore, the evidence presented clearly demonstrated that the problems with providing proper weights were *systemic.* The arbitrators may be correct that Hoffman failed to prove *all,* or even *most,* of the persistent weight shortages he claimed for all loads he delivered in 1995 and 1996 for which he claimed damages. However, Hoffman undeniably proved that he was "shorted" by the Cargill scales on one load on July 8, 1996, and that the problem causing the "short" weight on that occasion was *systemic.* The arbitrators failed to consider the effect of any breach of the contracts by Cargill—as the result of the undeniable evidence that Cargill obtained false weights on July 8, 1996, and just as importantly, undeniable evidence that the problem was systemic in nature—upon Cargill's own claims of breach of contract by Hoffman, including whether Cargill was entitled to "cure" its breach by providing for alternative delivery or weighing locations, or whether Cargill's breach simply excused Hoffman from any or all of the contracts.[14] Such fundamental errors and

---

14. Hoffman sought damages for shortages on each and every load he delivered to Blair in 1995 and 1996. The court agrees with the arbitrators to the extent that they found there was inadequate evidence to support such a damages claim. However, Hoffman's damages as related to the contracts under arbitration, this court believes, should have been the difference between what he would have received had Cargill not breached the contracts by obtaining false weights and what he actu-

ally obtained from the sale of his grain to alternative buyers, or in the absence of such actual damages, "nominal" damages for Cargill's technical violation of the contracts. *See generally Scallon v. U.S. Ag Ctr., Inc.,* 42 F.Supp.2d 867 (N.D.Iowa 1999). Furthermore, as the court indicated in the body of this opinion, the arbitrators failed to consider whether proof that Cargill obtained false weights on one occasion, as the result of a systemic problem with obtaining weights at

unfounded determinations of law and fact provide sufficient ground to deny confirmation of the arbitration award in this case on the ground that it is "completely irrational." Confirmation of the arbitration award may therefore be denied on this ground alone or in combination with any other deficiencies.

*ii. "Manifest disregard of the law" challenges.* Hoffman makes assertions that the court has construed to be that the arbitration decision was in manifest disregard of the law. He contends that the arbitration panel ignored specific NGFA rules and state and federal statutes that were purportedly applicable to Cargill's conduct. As this court noted, the Eighth Circuit Court of Appeals has explained that "manifest disregard of the law" means that the arbitrators "understand and correctly state the law but proceed to disregard" it. *Kiernan,* 137 F.3d at 594–95 (citing *Stroh Container Co.,* 783 F.2d at 750).

The court finds that none of Hoffman's specific assertions amounts to a manifest disregard of the law by the arbitrators. First, Hoffman asserts that the arbitrators ignored his proof that Cargill violated 7 U.S.C. § 270, which prohibits issuance of false or fraudulent weight certificates and imposes criminal sanctions for such conduct; ignored his proof that Cargill violated NGFA Grain Trade Rule 4, which, in pertinent part, defines and requires affidavit or other specified kinds of weights upon delivery of grain, as well as NGFA Grain Trade Rules 22, 33, 41, and 43; ignored his proof that Cargill violated various state regulatory statutes; and ignored Cargill's false assertion that its weighers were licensed under the United States Warehouse Act.

■■ As to purported violations of NGFA Grain Trade Rules, the arbitrators stated that they had looked beyond the rules to the express terms of the contract,

which they held took precedence over NGFA rules. Thus, there was no "manifest disregard" of the NGFA Grain Trade Rules; at most, there was an unreviewable legal error as to the applicability of those rules. *UHC Management Co.,* 148 F.3d at 998 (" 'We may not set an award aside simply because we might have interpreted the agreement differently or because the arbitrators erred in interpreting the law or in determining the facts.' ") (quoting *Kiernan,* 137 F.3d at 594); *see also Kiernan,* 137 F.3d at 594–95 ("Regardless of the wisdom of the panel's [legal] conclusion, it in no way demonstrates a manifest disregard for the law warranting vacation of the arbitration award in this case.").

■■ It is true that the arbitrators never addressed in their written decision Hoffman's assertions of violations of state and federal statutes, but observed only that the State of Nebraska Department of Agriculture was the proper regulatory body to police compliance of Cargill's scales. Whether or not the arbitrators should have considered violations of state and federal statutes in making their determination again rises no further than an unreviewable error in interpretation of the law, not to a "manifest disregard" of the law. *See UHC Management Co.,* 148 F.3d at 998; *Kiernan,* 137 F.3d at 594–95.

Thus, Hoffman is not entitled to denial of confirmation of the arbitration award on the basis of "manifest disregard of the law."

*iii. "Fundamental unfairness" challenges.* Hoffman has made various challenges that this court has construed to be challenges to the "fundamental fairness" of the arbitration proceedings. His fairness challenges go primarily to the manner in which the arbitration panel was selected under NGFA rules and to the failure of the NGFA rules to provide means for compelling witnesses to appear or other dis-

---

the Blair facility, constituted breach by Cargill of some or all of Hoffman's contracts,

which may have excused Hoffman's performance of those contracts.

covery to be had.[15] Hoffman also challenges on "fairness" grounds the appeal procedures under NGFA arbitration rules. Thus, Hoffman mounts essentially "institutional" challenges to the fundamental fairness of his proceedings. The court also promised to return to the first two of Hoffman's "fairness" issues, which were first evaluated under statutory standards, to evaluate them on the basis of "fundamental unfairness."

As this court observed, the Tenth Circuit Court of Appeals has treated "fundamental unfairness" as an independent, extra-statutory ground for review of an arbitration award. *See P & P Indus., Inc.*, 179 F.3d at 870 ("In addition to these statutory grounds for vacation [under 9 U.S.C. § 10(a)], courts have on occasion vacated arbitration awards which violate public policy, were based on a manifest disregard of the law, or were arrived at without a fundamentally fair hearing.") (citing *Denver & Rio Grande*, 119 F.3d at 849). This court also observed above that, whatever the scope of "fundamental unfairness" review may be, it is plain that all of the courts to entertain it look only to the "fundamental unfairness" of the *proceedings*, not the "fundamental unfairness" of any determination or award by the arbitration panel. *See P & P Indus., Inc.*, 179 F.3d at 870 (considering whether the challenging party received "a fundamentally fair hearing"); *Trans Chem. Ltd. v. China Nat'l Machinery*, 161 F.3d at 319 (adopting the district court's decision, which stated the standard as be "whether the arbitration proceedings were 'fundamentally fair,'" 978 F.Supp. at 303); *Tempo Shain Corp.*, 120 F.3d at 20 (concluding that judicial "review is restricted to determining whether the procedure was fundamental-

ly unfair"); *Gulf Coast Indus. Workers Union*, 70 F.3d at 850 (the question addressed on judicial review of an arbitration award is "whether the arbitration proceedings were fundamentally fair"). This standard is not a "backdoor" way for a court to review the merits of the dispute *de novo*. *See, e.g., UHC Management Co.*, 148 F.3d at 998 (one principle of judicial review of arbitration awards is that review is "limited" or "narrow," and an arbitration award cannot be overturned simply because the court would have interpreted the agreement differently, or because the arbitrators erred in interpreting the law or in determining the facts).

▮ The court recognizes that "fundamental unfairness" of proceedings does not suggest a constitutional or "due process" standard. *See Gallus Inv., L.P.*, 134 F.3d at 234 (rejecting a party's challenge to an arbitration award on the denial of its "right to a 'fundamentally fair hearing' and 'due process,'" concluding no constitutional claim was implied). Rather, the question would seem to be whether a reasonable person in the circumstances of the parties would consider that the parties had received a fair opportunity to present evidence before impartial arbitrators. *See Ficek v. Southern Pac. Co.*, 338 F.2d 655, 657 (9th Cir.1964) (noting that a court may decline to recognize an arbitration award if the arbitration proceedings do not provide, *inter alia*, a "full and fair hearing"), *cert. denied*, 380 U.S. 988, 85 S.Ct. 1362, 14 L.Ed.2d 280 (1965); *cf. ANR Coal Co., Inc.*, 173 F.3d at 500 (the party seeking vacation of an arbitration award pursuant to § 10(a)(2) bears the burden of proving "that a reasonable person would have to conclude that an arbitrator was partial to the other party to the arbitration") (inter-

---

15. Again, because the arbitrators were not authorized by the NGFA arbitration rules to issue subpoenas or compel discovery, their specific failure to do so in this case cannot be challenged, either as "misconduct" under 9 U.S.C. § 10(a)(3), or the court now holds, under "fundamental unfairness" standards.

On the other hand, had the arbitrators done something not authorized by the governing arbitration rules, such conduct might be challengeable under § 10(a)(3), as "misconduct," or under § 10(a)(4), as conduct in excess of authority, or under "fundamental unfairness" standards.

nal quotation marks and citation omitted). However, a "perfect" hearing is not required, *see Employers Ins. v. National Union Fire Ins. Co.*, 933 F.2d 1481, 1491 (9th Cir.1991) (concluding that although a party did not receive a "perfect hearing," the party did receive a fair hearing), nor are standards of civil practice in federal court determinative, *see Kiernan*, 137 F.3d at 594–95 (rejecting the "niceties" of federal judicial requirements of allocation of burden of proof as a proper measure of arbitration proceedings), because one of the goals of arbitration is "a less costly and less complicated alternative to litigation." *See, e.g., Morgan v. Smith Barney, Harris Upham & Co.*, 729 F.2d 1163, 1165 (8th Cir.1984).

Although this standard takes into account deficiencies that are also encompassed to some extent by statutory considerations, *see* 9 U.S.C. § 10(a)(2) (partiality) & (a)(3) (other misconduct), the court believes that the "fundamental unfairness" standard permits the court to review the impact of the totality of the circumstances and consider the procedures employed as a whole, rather than the "fairness" of specific procedures. Furthermore, the court believes that the standard for "fundamental unfairness" should impose more stringent requirements upon the proceedings where, as here, arbitration and the rules governing that arbitration are imposed in an adhesion contract. *See Hoffman*, 968 F.Supp. at 472–73 (considering but not deciding whether the contracts at issue are adhesion contracts). In such circumstances, any presumption that the parties are "both sophisticated in the realms of business and law, [and] can be presumed to have been well versed in the consequences of their decision to resolve their disputes in this manner," *see Stroh Container Co.*, 783 F.2d at 751, is considerably undermined.

Also, the court does not believe that a complaining party is required to show that the proceedings prejudiced that party in the presentation of claims or contentions, if the proceedings were in fact "fundamentally unfair" according to an objective standard. However, the court concludes that Hoffman has shown sufficient prejudice in this case from the alleged "fairness" violations, either singly or collectively, to satisfy any prejudice requirement.[16]

■ The court's "fundamental unfairness" review of the present arbitration proceedings begins with the selection of the arbitrators. The manner in which arbitrators are selected under NGFA arbitration rules was described *supra* on page 44. The NGFA method for selection of arbitrators might be characterized as "inbred," in that not only are the arbitrators selected from one side of the dispute, grain buyers *vis-à-vis* the individual grain producer, by virtue of the nature of NGFA membership, but they are selected and confirmed by persons sharing at least the same appearance of bias, the NGFA secretary and chairman, and that procedure for selecting arbitrators was imposed here by a member of the NGFA in an adhesion contract dictating arbitration of all disputes. The court cannot imagine circumstances in which a reasonable person would agree to

---

**16.** Specifically, Hoffman was prejudiced by his inability to obtain documents from Cargill through targeted, enforceable discovery, as opposed to the voluntary discovery provided in this case, which amounted to little more than killing Hoffman with kindness, because so much irrelevant information was provided as to obscure any pertinent information. He was also prejudiced by his inability to obtain assistance of an expert to evaluate discovery materials; Cargill's offer to provide its own personnel to help Hoffman evaluate materials does not limit such prejudice, because it did not give Hoffman any access to an objective third party. It seems strange to the court that Cargill would so readily agree to arbitrators who were clearly members of the industry, and at least potential competitors, but be so reluctant to have anyone similarly qualified assist Hoffman as his "expert." Hoffman was also prejudiced by the financial requirements for appeal, because, as he argued, those requirements effectively limited appeal rights to those who could afford to pay the full costs of an arbitration award up front.

resolution of a dispute with another party in which the other party gets to pick all the arbitrators or has dictated that the arbitrators be selected from persons or entities like the other party. It is one thing if the membership of an organization provides the pool of potential arbitrators of a dispute *between members of the organization;* it is quite another if such a procedure can be imposed upon one party to a dispute who is not a member of the organization by the party to the dispute who is a member. Thus, NGFA arbitration does not provide what a reasonable person in the circumstances of the parties would consider a fair opportunity to present evidence before *impartial* arbitrators.

Nor does the court believe that "fundamental fairness" is satisfied by arbitration procedures that do not provide one party with any means of compelling the presence of witnesses or documents, at a minimum at the arbitration hearing, if not prior to such a hearing. The FAA contemplates such a power to compel appearance of persons and documents in 9 U.S.C. § 7. The NGFA and Cargill hasten to argue that § 7 of the FAA is not "mandatory," in that it only states that the arbitrators "*may* summon in writing any person to attend before [the arbitrators] as a witness and in a proper case to bring with him or them any book, record, document, or paper which may be deemed material as evidence in the case." 9 U.S.C. § 7 (emphasis added). Nonetheless, the need for such a procedure as a partial guarantee of fairness is apparent from its inclusion in the FAA. Furthermore, what is permissive under the statute—*i.e.*, left to the arbitrators' discretion—is the issuance of a particular summons. It is curious that any set of arbitration rules would forego a power the FAA specifically authorizes arbitrators to exercise. The reasonable need for some means of compelling the opposing party to produce witnesses and documents, at least for the arbitration hearing if not in preparation for that hearing, is painfully apparent in a case like this one in which nearly all of the information pertinent to the

maintenance, testing, and accuracy of the scales was in the exclusive possession of the opposing party. The parties here are to be applauded for their good faith efforts to work out voluntary discovery procedures and voluntary appearance of witnesses to try to compensate somewhat for the absence of formal procedures to compel such access to evidence. Nevertheless, as the parties admit, that voluntary discovery during the arbitration under review here occurred in the shadow of this court's warning that it would review the arbitration procedures for fundamental fairness. The fact that discovery beyond the provisions of the NGFA rules was conducted in an attempt to mollify concerns of this court is in some ways an indication of the fundamental unfairness of the absence of some means of compelling access to relevant evidence under the NGFA rules. The purposes of arbitration, such as provision of a speedy, "less costly and less complicated alternative to litigation," *see, e.g., Morgan,* 729 F.2d at 1165, cannot be used to justify all manner of unfairness or inadequacy of the proceedings, at least not when the arbitration procedures are dictated to one party by the other with no real opportunity to negotiate them. Thus, NGFA arbitration does not provide what a reasonable person in the circumstances of the parties would consider a *fair opportunity to present evidence* before impartial arbitrators.

Finally, Hoffman asserts that the appeal provisions under the NGFA arbitration rules are fundamentally unfair, because they are, as a practical matter, restricted to the wealthy or those with liquid assets. The FAA does not provide for appeals from one level of arbitration to another, but only from the district court entertaining an action to stay or compel arbitration, or to modify, correct, or vacate an arbitration award to the appropriate Circuit Court of Appeals. *See* 9 U.S.C. § 16. Judicial review of arbitration awards remains available under the FAA, although such judicial review ordinarily cannot go to the merits of the arbitrators' decision. Thus,

the "unfairness" of NGFA appeal procedures, if any, does not reside in the lack of or necessity for an appellate review within the arbitration process itself. However, to the extent that the NGFA arbitration rules provide for appeal to an appellate arbitration panel, the rules are not "fundamentally fair," in that they do restrict access to the procedure to those losing parties able to pay a judgment in full within the limited time available to file an appeal. Again, such a differentiation between parties should not be justified on the ground that arbitration is meant to be a quick and decisive means of resolving disputes, because no reasonable person would consider trading away "fundamental fairness" merely for speed.

Furthermore, taken as a whole, in light of these various deficiencies, the NGFA arbitration rules do not provide what a reasonable person in the circumstances of the parties would consider a fair opportunity to present evidence before impartial arbitrators. On this independent, extra-statutory ground, the court finds that the present arbitration award should not be confirmed pursuant to 9 U.S.C. § 9.

The Federal Arbitration Act, 9 U.S.C. §§ 1–16, is more than an abstract principle of law. At bottom, this case is about application of the FAA in the real world of a dispute between a farmer and a grain processor, in which the farmer's, Hoffman's, very livelihood is at stake. At the time Hoffman signed the grain contracts now in dispute, his reasonable expectations for a fair arbitration proceeding—if arbitration ever came to pass—surely could not have extended to a proceeding so lacking in fundamental fairness as the one he ultimately received. As ADR grows in popularity and use, it is imperative that federal courts not allow speed and alleged cost savings to substitute for fundamental fairness. Courts must be vigilant to insure that expediency is not elevated over fundamental fairness in the name of ADR.

## III. CONCLUSION

The court finds that it has subject matter jurisdiction to hear Cargill's motion to confirm an arbitration award pursuant to 9 U.S.C. § 9. Section 9 of the FAA is a special venue provision, not a limitation on the jurisdiction of this court to hear Cargill's motion to confirm the award. Venue for Cargill's confirmatory action is properly laid in this district, and this district court has subject matter jurisdiction over the action, because this court has diversity subject matter jurisdiction over the parties' claims and personal jurisdiction over the parties themselves. Furthermore, this court retained jurisdiction to confirm or vacate the arbitration award, because it is the court that granted the motion to compel arbitration. Thus, Hoffman's challenge to the court's subject matter jurisdiction is **overruled.**

Turning to the judicial review itself, although Hoffman has failed to demonstrate any statutory ground for vacation or denial of confirmation under § 10 of the FAA, he has satisfied two extra-statutory grounds for such vacation or denial of confirmation. First, the court concludes that the arbitration panel committed fundamental errors and made wholly unfounded determinations of law and fact in its conclusions that "no load shortages occurred" and that any shortages had no effect on Cargill's breach-of-contract claim, which are sufficient to deny confirmation on the ground that the award is "completely irrational." Furthermore, the court concludes that the arbitration proceedings under the NGFA arbitration rules were not "fundamentally fair," that is, they were not such that a reasonable person in the circumstances of the parties would consider that each party had a fair opportunity to present evidence before impartial arbitrators. The deficiencies demonstrating such "fundamental unfairness," either singly or in their totality, in the context of arbitration proceedings and rules imposed in an adhesion contract, include the appearance of bias arising from the manner in which the arbitrators are

selected under NGFA arbitration rules, the failure of the rules to provide a means to compel the appearance of witnesses and documents, and the lack of arbitration appeal procedures available to all participants.

Therefore, Cargill's motion to confirm the arbitration award is **denied** and Hoffman's motion to vacate the award is **granted.** The court declines to direct a rehearing by the arbitrators pursuant to 9 U.S.C. § 10(a)(5), because the thirty days after receipt of final papers within which the arbitrators were to endeavor to make their report under NGFA Arbitration Rules § 8(k) has long since passed, and rehearing in a process this court has determined is not fundamentally fair would be fruitless. *See* 9 U.S.C. § 10(a)(5) (direction for rehearing by the arbitrators is in the discretion of the reviewing court if the time within which the award was to be made has *not* expired).

**IT IS SO ORDERED.**